**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Insook KIM, aka In Sook Kim,**
**Defendant–Appellee.**

No. 01–30166.

United States Court of Appeals,
Ninth Circuit.

Submitted March 7, 2002.*

Filed June 6, 2002.

* The panel unanimously finds this case suitable for decision without oral argument. Fed. R. App P. 34(a)(2).

John C. Laing, United States Attorney, District of Oregon, Portland, OR, for the plaintiff-appellant.

Kenneth Ricardo Perry, Portland, Oregon, for the defendant-appellee.

Before: B. FLETCHER, O'SCANNLAIN and BERZON, Circuit Judges.

BERZON, Circuit Judge.

The United States appeals the district court's order granting defendant-appellee Insook Kim's ("Kim") motion to suppress incriminating statements that she made during the execution of a search warrant at her store. The district court found that she was "in custody" for *Miranda* purposes, and therefore entitled to the familiar warnings before questioning began. The government appeals, contending that Kim was not in custody and therefore not entitled to the warnings. We affirm.

## I.

Investigators obtained evidence that Kim's store, the "Lil' Brick Deli," was selling large quantities of pseudoephedrine, the main precursor chemical in the production of methamphetamine. A Drug Enforcement Agency (DEA) investigator and a Korean-speaking sheriff's deputy went to Kim's store in October 1999 to advise her about the connection between sales of large quantities pseudoephedrine and methamphetamine production.

Eight months later, an undercover officer purchased a case of pseudoephedrine at Kim's store from her employee Sang Kyun Kim. Soon thereafter, on August 3, 2000, police officers executed a search warrant at the Lil' Brick Deli, where they found Kim's 18–year–old son, Kevin, running the store. They read Kevin the search warrant, handcuffed him, and began to question him. Kevin's handcuffs were removed at some point during the search—before Kim entered the store—but the police continued to question him.

Kim and her husband, the store's co-owner, were at home the morning of the search. An officer came to their home looking for Sang Kyun Kim, who had previously been staying at their home. After the officer's visit, Kim tried to reach her son Kevin at the store. When no one answered the phone, Kim and her husband became alarmed and drove to the store to see if anything was wrong.

According to Kim, her husband, and her son, in consistent testimony credited by the district court, this is what happened next: When Kim and her husband arrived, they noticed many police cars in the parking lot and found the door locked. Kim knocked and shook the locked door. When an officer opened the door halfway, she explained that she and her husband were the owners of the store. The officer allowed Kim inside the store. When her husband tried to enter immediately behind her, the officer quickly shut the door in front of him and locked it from the inside. Kim's husband knocked on the door again, but no one answered, so he waited—for about three hours—in the parking lot outside the store.

Once inside, Kim called out in Korean for her son, asking if he was okay. The police, however, had told Kevin before his mother entered the store that he was not to communicate with her. One officer ordered Kim to speak English, not Korean, and another officer told her to "shut up." Kevin testified that while his mother was not crying or screaming when she entered the store, her face did look "really white." The officers directed her to an adjoining seating area, where she sat while the officers searched the store. Some time later,

they sat her at another table, and Detective James G.W. Lilley began to question her.[1]

Kim told Detective Lilley that she did not speak English well but was taking lessons. Kevin too informed the officers that his mother did not speak English very well; he also advised them that she would be frightened because of all the police cars outside the store. The officers did not handcuff Kim at any point, but at least two officers sat and stood around her in such a way that, as she testified, she felt surrounded by them.

According to Kim, no one told Kim that she was free to leave. Kim estimated that she was questioned for about an hour before the interpreter arrived and for another 30 minutes once he did. Detective Lilley stated that he questioned Kim for 30 minutes before a Korean interpreter arrived, and that the interpreter questioned her for another 15 to 20 minutes; the district court based its findings on these shorter estimates. The government concedes that at no time did Kim receive *Miranda* warnings.

Detective Lilley's testimony differed from that of Kim and Kevin in two respects: Lilley stated that he sat Kim in such a way that she would have been able to exit without having to get around a police officer, and that he told Kim that she was not under arrest and could leave at any time.

During the course of the interview, Kim identified the sources of her pseudoephedrine supply. She explained how she sold the cases of pseudoephedrine and the markup she used for cases from the various suppliers. She also told police that the money stored in the store's safe came ex-clusively from sales of pseudoephedrine. When the officers completed their search and interrogation, they left the store without arresting either Kim or her son.

Kim was later indicted and arrested for possession and distribution of pseudoephedrine with knowledge and reasonable cause to believe that it would be used to manufacture methamphetamine, in violation of 21 U.S.C. § 841(d)(2). The indictment also included one count of forfeiture to the government of any and all property derived from the proceeds of pseudoephedrine sales.

Kim filed a pre-trial motion to suppress the incriminating statements she made while being questioned during the search, arguing that they were taken in violation of her Fifth Amendment rights. The district court granted the motion, basing its conclusion on the following factual findings:

> [W]hen defendant arrived at her store, she discovered a number of police cars and official-looking vehicles in the lot. She was denied access to the store initially, despite the presence of her son inside the store. When she was admitted inside by an officer, the door was immediately locked behind her, and she was separated from her husband, who had also arrived at the store. Once inside, her communication to her son was limited or denied, and she was directed to another area of the store, where at least two officers sat with her.

The district court also found that:

> [T]he officers knew defendant was Korean and may have difficulty in comprehending English (as evidenced by the facts that the police included a Korean-

---

**1.** In its response to the motion to suppress, the government stated that DEA Investigator Roger Beltz conducted the interview, but at the suppression hearing, Detective Lilley testified that he interviewed Kim himself. The government's Opening Brief indicates that both Beltz and Lilley were present during the interview but leaves unclear what role each of them played.

speaking official during the visit to defendant in October, 1999, and that defendant's son advised the police that his mother would likely be very confused or frightened by the circumstances). Accordingly, the police were aware that defendant could have significant difficulty understanding what was being said to her or comprehending what was happening at the store.

The district court specifically rejected the testimony that the officers told Kim that she was free to leave.

"After reviewing all pertinent facts and evaluating the testimony presented at the hearings," the district court found "that the circumstances during the questioning of defendant warranted advising defendant of her rights." "[A] reasonable person, after being separated from a spouse, precluded from speaking to a son, and having the store entry locked behind her," the court concluded, "would not believe she was free to leave." The court noted that its conclusion was "further bolstered by" the fact that the officers knew that Kim may have difficulty understanding English and that Kevin had "advised the police that his mother would likely be confused and frightened by the circumstances." The district court therefore granted the motion to suppress Kim's statements on the grounds that she indeed was in custody at the time of the interrogation and so should have been advised of her *Miranda* rights.

## II.

### A. Standard of Review

■ The parties dispute the proper standard of review of the district court's determination that Kim was in custody for *Miranda* purposes. Although some recent Ninth Circuit cases, it is true, have characterized the "in custody" determination for *Miranda* purposes as essentially a question of fact reviewed for clear error, *see,*

*e.g., United States v. Butler,* 249 F.3d 1094, 1098 (9th Cir.2001), we recently recognized that the clear error standard of review for "in custody" determinations adopted by *People of the Territory of Guam v. Palomo,* 35 F.3d 368, 375 (9th Cir.1994), was rejected by the Supreme Court in *Thompson v. Keohane,* 516 U.S. 99, 112–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). *United States v. Galindo–Gallegos,* 255 F.3d 1154 (9th Cir.2001), *modifying* 244 F.3d 728 (9th Cir.). Now, "[w]hether a person is 'in custody' for purposes of *Miranda* is a mixed question of law and fact warranting *de novo* review." *Id.; see also United States v. Hayden,* 260 F.3d 1062, 1066 (9th Cir.2001). The factual findings underlying the district court's decision, however, are reviewed for clear error. *Keohane,* 516 U.S. at 112, 116 S.Ct. 457; *United States v. Andaverde,* 64 F.3d 1305, 1313 (9th Cir.1995).

### B. Whether Kim Was "In Custody"

■ An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is "in custody." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (internal quotation marks omitted). The inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned. *Id.* at 323, 114 S.Ct. 1526. That is, we must determine whether "the officers established a setting from which a reasonable person would believe that he or

she was not free to leave." *United States v. Beraun–Panez*, 812 F.2d 578, 580 (9th Cir.), *modified by* 830 F.2d 127 (9th Cir. 1987); *see also Hayden*, 260 F.3d at 1066. The following factors are among those likely to be relevant to deciding that question: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Hayden*, 260 F.3d at 1066 (citing *Beraun–Panez*, 812 F.2d at 580). Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators; the *Beraun–Panez/Hayden* factors are simply ones that recur frequently.

The district court's factual findings are not clearly erroneous, as they are supported by testimony in the record that the judge determined was credible. After reviewing the factual findings under all of the circumstances, including both the above factors and others, we conclude that Kim was "in custody" for *Miranda* purposes because a reasonable person in Kim's circumstances would not have felt free to leave. *See id.*

■ The police did not summon Kim to the store, or require her to enter the store once she arrived in the parking lot. Rather, she came to the store voluntarily because she was alarmed that her son did not answer the store's phone when she called to check on him. When she arrived to find the door locked, she knocked and asked that the police allow her and her husband inside because they were the store's owners.

In determining whether suspects were "in custody" for *Miranda* purposes, the Supreme Court has considered whether they voluntarily approached or accompa-

nied law officers *understanding that questioning would ensue*. *See California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1982) (per curiam) (holding that defendant was not in custody when he agreed to accompany police to the station to answer questions and was allowed to leave immediately afterward); *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711 (holding that defendant was not in custody when he came to the station voluntarily and left "without hindrance" after 30 minutes of questioning). We, too, have found that suspects were not in custody where the circumstances included volunteering to answer law officers' questions. *See, e.g., Hayden*, 260 F.3d at 1066–67; *United States v. Hudgens*, 798 F.2d 1234, 1236–37 (9th Cir.1986).

There is a critical distinction, however, between voluntarily entering one's own place of business without any intention to present oneself for a police interview, and voluntarily accompanying the police to their station upon request for the very purpose, known in advance, of answering their questions. Here, Kim did not willingly agree to submit to an encounter with the police. Rather, she went to her store because an officer's visit to her home caused her to worry about her son when he did not answer the store's phone. Arriving at the store to find the place surrounded by police cars did not alleviate her concerns, so she sought to enter the store to check on her son's situation. Although Kim did arrive at the store voluntarily, she did not do so to speak to the police. That the police did not summon her to the store in the first place, imperatively or otherwise, is therefore entirely uninformative in determining the dispositive question— whether Kim would have felt free to leave once the questioning started.

If the police ask—not order—someone to speak to them and that person comes to

the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter. By contrast, someone who comes to her own store with no intention of submitting to questioning is not likely to harbor the same understanding once police interrogation nonetheless begins—especially if, as here, she is ordered to shut up, seated in isolation away from two other family members, and then questioned.

Voluntary initiation of contact with the police cannot be, under any circumstances, the end of the inquiry into whether a defendant was "in custody" during the encounter. If an individual voluntarily comes to the police station or another location and, once there, the circumstances become such that a reasonable person would not feel free to leave, the interrogation can become custodial. The Supreme Court cases relying on the voluntary initiation of the police encounter or on the location of the interrogation so indicate, as none rely *solely* on either factor. *See, e.g., Mathiason,* 429 U.S. at 495, 97 S.Ct. 711 (finding "no indication that the questioning took place in a context where [defendant's] freedom to depart was restricted in any way"); *Beheler,* 463 U.S. at 1125, 103 S.Ct. 3517 (finding that defendant's "freedom was not restricted in any way whatsoever" and that the prior identification of the defendant as a suspect and the fact that the interview was in a police station were not alone enough to create a custodial situation).

Our similar cases rely on the fact that the initial encounter with the police was voluntary only in the absence of other circumstances indicating that the interview later became coercive. *See Hayden,* 260 F.3d at 1066 (the defendant "was told explicitly that she was free to leave at anytime," her "ability to leave was [not] in any other way restrained," and "the duration of the interviews was [not] excessive[and] undue pressure was [not] exerted"); *United States v. Gregory,* 891 F.2d 732, 735 (9th Cir.1989) (the defendant "consented to be interviewed in his house, he was interviewed in the presence of his wife, the interview lasted only a brief time, and no coercion or force was used"); *Hudgens,* 798 F.2d 1234 (the defendant voluntarily entered a police car to talk to the police, the agents did not use intimidating or coercive language during the interview, and the defendant testified that he did not feel coerced by the agents).

The one case we have found that is on the surface factually close to this one is *United States v. Crawford,* 52 F.3d 1303 (5th Cir.1995), in which the district court had concluded that the defendants were not in custody after they voluntarily entered their own electronics store during a search. Reviewing the denial of a motion to suppress under a deferential standard, the Fifth Circuit concluded that "it cannot be said that the trial court's findings are not plausible." *Id.* at 1309.

There are significant factual differences between this case and *Crawford.*[2] More

2. The district court in *Crawford* had found that the testimony of one of the defendants "did not indicate that he was coerced into making a statement," and that both defendants "were more worried about their electronic equipment, not having their shop disrupted than they were about being held in custody." *Id.* at 1308. Moreover, the police in *Crawford* allowed one of the defendants to telephone the other, rather than, as here, restricting communication among family members—including locking the defendant's husband out of his own store. *Id.* at 1307. Also, one of the defendants in *Crawford* testified that "[n]o one ever told him to sit in a certain place, but he had the impression that he should sit down," *id.* at 1308, while here the officers issued peremptory orders as to where Kim and her son could sit and whether they could speak to each other.

importantly, however, the deferential standard of review of the district court's *denial* of the motions to suppress weighed much more heavily in favor of a finding on appeal that the defendants were not "in custody." Because we are reviewing the "in custody" determination *de novo, Crawford* is not particularly informative. *Fernandez v. Roe,* 286 F.3d 1073, (9th Cir.2002) (distinguishing precedent that "review[ed] for 'clear error,' unlike the *de novo* review applied here").[3]

To support its argument that Kim was not "in custody" for *Miranda* purposes during the search, the government relies on *Michigan v. Summers,* 452 U.S. 692, 701–02, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). *Summers* held the police's detention of an individual at his home during the execution of a search warrant did not constitute a seizure under the Fourth Amendment. The government contends that, although *Summers* did not address the issue of custodial interrogation, its principles support the conclusion that police officers executing a search warrant need not give *Miranda* warnings to an individual detained and questioned during a search. We disagree.

In the Fourth Amendment context, locking doors and restricting the occupants' movement are often reasonable police procedures to control access to a scene during the execution of a search warrant. *See id.* at 702–03, 101 S.Ct. 2587 ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."). But whether an individual detained during the execution of a search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is "in custody" for *Miranda* purposes are two different issues.

In *Summers,* the Supreme Court found that the defendant "was not free to leave the premises while the officers were searching his home," and that his detention constituted a seizure, albeit a reasonable one under the Fourth Amendment. *Id.* at 696, 101 S.Ct. 2587. The police did not interrogate Summers during the detention. If they had asked questions going beyond a brief *Terry*-type inquiry, *see Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (permitting a brief stop and inquiry that are "reasonably related in scope to the justification for their initiation"), Summers would, it appears, have been entitled to *Miranda* warnings. *See Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (When there is a brief *Terry* detention, officers may, without giving *Miranda* warnings, ask only "a moderate number of questions to determine [a person's] identity and to try to obtain information confirming or dispelling the officer's suspicions."). Thus, while the reasonable and necessary steps

---

**3.** In addition to disputing our characterization of *Crawford,* the dissent also argues that *Palomo,* 35 F.3d at 375, rejected a distinction between voluntarily approaching the police expecting to be questioned and voluntarily entering one's own store to check on family members. We disagree. *Palomo* concluded only that "[the defendant's] assertion that he went to the station only because his relatives had been taken there does not, *without more,* indicate that he did not initiate contact with the police." *Id.* at 375 (emphasis added). In support of his contention that he was "in custody," Palomo argued only that he was a suspect before the interview, that he appeared only because the police had taken his relatives to the station, and that an officer confronted him with evidence of guilt. *Id.* The opinion refers to no other allegations or evidence of coercive circumstances at the station. *See id.* Moreover, like *Crawford, Palomo* was reviewing the district court's *denial* of a motion to suppress under the former clear error standard. *Id.* ("Where no findings of fact were made, this court will uphold the denial of the motion to suppress if there is a reasonable view of the evidence that will sustain it.").

that the officers took to secure Kim's store during the search may preclude a conclusion that she was unconstitutionally seized, the locked doors and restriction of Kim's movement are still relevant to whether she was entitled to *Miranda* warnings before the police questioned her. *See Booth,* 669 F.2d at 1236 (upholding the district court's determination that defendant who had been handcuffed and frisked was "in custody," while noting that "[s]trong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody.").

Further, isolating the defendant from the outside world—here from her husband who had tried to join her in the shop—largely neutralizes the familiarity of the location as a factor affirmatively undermining a finding of coercion. We so recognized in *Beraun–Panez,* 830 F.2d 127. In *Beraun–Panez,* the officers interrogated the defendant at the side of the road in familiar surroundings but intercepted one of Beraun–Panez's co-workers who tried to approach him. We found that "by keeping [defendant] isolated from other people, the officers contributed to the custodial nature of the interrogation," 830 F.2d at 127, noting that the coercive impact of enforced isolation is particularly strong where the defendant "may have had some difficulty in understanding English," 812 F.2d at 581.

Our point is not that the situation here was decidedly coercive "simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711. Rather, the police in this case temporarily took over complete control of Kim's store, creating "a police-dominated atmosphere," in which the police kept Kim physically isolated from two family members who could have provided both moral support and, given her limited English, a more complete understanding of the overall situation. *See Beraun–Panez,* 830 F.2d at 127 ("The Supreme Court in *Miranda* noted that separating a subject from others, who might lend moral support to a person questioned and thereby prevent inculpatory statements, was a technique of psychological coercion.").

Additionally, this was a full-fledged interrogation, not a brief inquiry. The district court found that Kim was detained for "some time" before questioning began. Then, she was questioned for at least 30 minutes before an interpreter arrived and another 20 minutes once the interpreter joined the interrogation. The police had in an earlier encounter warned Kim of the possible criminal aspects of pseudoephedrine sales; they were in the process of searching her store; and they had earlier in the day come to her home looking for an employee. Given all those circumstances, Kim could well have assumed—especially given her limited English—that she was a criminal suspect. That the questions to Kim covered in detail her pseudoephedrine sale activities—including her sources, her customers, and where she kept the proceeds—could only have reinforced that impression. Under these circumstances, we find the overall length and manner of questioning, both before and after the interpreter arrived, to support the conclusion that Kim was "in custody."

In sum, Kim's voluntary entrance into the store and the fact that she was familiar with the location of the interview, considered in isolation, might weigh in favor of concluding that she was not "in custody" during the questioning. Nevertheless, under all the circumstances here, we conclude that a reasonable person would not have felt free to leave and therefore that Kim was sufficiently restrained so as to be considered "in custody." Whether or not

they intended to surround Kim to make her feel that she could not leave the store, the position of the officers, the fact that they locked Kim's husband out of their store, their restriction of her communication with her son, and their orders as to what language she should speak and when and where she could sit, combined with the length and nature of the questioning, would have made a reasonable person believe that she could not have just walked away. Under these circumstances, Kim would have reasonably felt compelled to stay in the store and answer the officers' inquiries for as long as they continued to question her—which is precisely what she did.

## CONCLUSION

We conclude that, under the totality of the circumstances, a reasonable person in Kim's circumstances would not have felt free to leave. We therefore hold that Kim was "in custody" when the police interrogated her without providing her with *Miranda* warnings, and AFFIRM the district court's order granting the motion to suppress Kim's statements to the police.

AFFIRMED.

O'SCANNLAIN, Circuit Judge, dissenting:

I respectfully dissent from the court's determination that Insook Kim was "in custody" for Fifth Amendment purposes when police officers questioned her. While paying lip service to the factors that properly guide our determination, the majority fails, in my view, to apply them faithfully to the facts before us.

### I

As the majority correctly states, an officer's obligation to give the traditional *Miranda* warning to a suspect applies only to custodial interrogation. "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. Cal.*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (quotation marks and brackets omitted). The inquiry should focus on the *objective circumstances* of the interrogation, not the subjective views of the officers or the individual being questioned. *Id.* at 323, 114 S.Ct. 1526. "An objective standard avoids imposing upon police officers the often impossible burden of predicting whether the person they question, because of characteristics peculiar to him, believes himself to be restrained." *United States v. Beraun–Panez*, 812 F.2d 578, 581 (9th Cir.), *modified*, 830 F.2d 127 (9th Cir.1987).

We ask whether, based upon a review of all the pertinent facts, "a reasonable innocent person in such circumstances would conclude that after brief questioning [she] would not be free to leave." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981); *see also United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality). Factors that we should consider in determining whether a person was in custody include: (1) the language used to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, 8151(3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the degree of pressure applied to detain the individual. *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 1117, 151 L.Ed.2d 1011 (2002).

### A

As to the first factor, the police did not summon Kim; rather, she came to her

store voluntarily. Indeed, the officers allowed her inside only after she knocked and shook the door. The Supreme Court has consistently found that a suspect is not in custody if she voluntarily approaches or accompanies law enforcement. *See Cal. v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (holding defendant was not in custody when he voluntarily accompanied police to the station for questioning and was allowed to leave after the interview); *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (holding defendant was not "clearly" in custody when he came to the station voluntarily and left "without hindrance" after a 30–minute interview); *see also Hayden*, 260 F.3d at 1066–67 (holding defendant was not in custody when she voluntarily appeared at FBI building for questioning and was told that she was free to leave); *People v. Palomo*, 35 F.3d 368, 375 (9th Cir. 1994) (holding defendant was not in custody despite "the duration of the interview and the nature of the interrogation room"

when he went to the police station voluntarily and "left of his own accord"); *United States v. Hudgens*, 798 F.2d 1234, 1236–37 (9th Cir.1986) (holding defendant was not in custody when he initiated contact with police, was not physically restrained, and was questioned for 45 minutes).[1]

The majority distinguishes between a person voluntarily approaching the police with the expectation that she will be asked questions and Kim's voluntarily entering her store. *Supra* at 976–77. To the majority, the fact that she voluntarily entered her store for the purpose of checking on her son does not suggest that she voluntarily subjected herself to the possibility of a police interview. Yet, we rejected a similar distinction in *Palomo*, where the defendant went to the police station because his relatives had been taken there— not to speak to the police. We held that the defendant's "assertion that he went to the station only because his relatives had been taken there does not, without more, indicate that he did not initiate contact

---

**1.** The majority's characterization of *United States v. Crawford*, 52 F.3d 1303 (5th Cir. 1995), as having "significant factual differences" from this case is, with respect, inaccurate. *See supra* at 977. In *Crawford*, the Fifth Circuit held that defendants were not in custody when they made incriminating statements during the execution of a search warrant at their electronics store. *Id.* at 1309. There, officers did not tell defendants that they were or were not free to leave, the defendants (who are husband and wife) could not move around the store without being accompanied by an agent and could not be in each other's presence, and one defendant came to the shop voluntarily after the search was underway, but was then "sandwiched between two men at all times." *Id.* at 1307–09. Like Kim, who was probably more worried about her son and having her store disrupted than about being questioned, the *Crawford* defendants were "more worried about their electronic equipment [and] not having their store disrupted than about being held in custody." *Id.* at 1308. Furthermore, the defendants

knew that the officers had found a small quantity of marijuana—evidence of their guilt—during the search. *Id.* at 1308. Thus, *Crawford's* "factual differences" from this case actually make the situation there more coercive. Despite *Crawford's* coercive aspects, however, the Fifth Circuit held that they did not constitute a custodial situation for *Miranda* purposes.

The majority attempts to distinguish *Crawford* primarily by relying on the standard of review exercised by the Fifth Circuit. First, it is not entirely clear what standard of review *Crawford* employed, as the court simply stated "[w]e review the district court's finding that the Appellants were not in custody at the time of the statements." *Id.* at 1307. Second, assuming *Crawford* did review for clear error, the more deferential standard of review did not appear to be the decisive factor in the court's decision, *i.e.*, the court was not torn between two equally meritorious arguments as the majority makes it seem. *Id.* at 1308–09.

with the police." *Palomo,* 35 F.3d at 375. The same must be said regarding Kim.[2]

Furthermore, it seems somewhat disingenuous to say that when Kim approached her store with police cars parked in front, found the front door locked, and then had to knock and gain entrance from an officer, that she had no expectation that maybe, just maybe, she might be called upon to answer questions.[3] While her purpose for coming to her store was to check on her son, once she saw the police presence and sought access to a premise that was being searched by law enforcement, it would be utterly naive to suggest that she did not consent to an encounter with the police.

## B

The second factor—the extent to which the defendant is confronted with evidence of guilt—is not implicated here. The record does not indicate that the officers confronted Kim with evidence of her guilt.

## C

The third factor looks to the physical surroundings of the interrogation. Here, Kim was in familiar surroundings—her own store—during the interview, which stands in direct contrast to the more coercive environment of a police station. However, the Supreme Court has found that even when questioning occurs at a police station there is not custody per se. *Beheler,* 463 U.S. at 1125, 103 S.Ct. 3517 ("[W]e have explicitly recognized that *Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" (quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711)). Here, of course, the familiar surroundings of Kim's store would be much less coercive than an interrogation room at the police station. *Cf. Michigan v. Summers,* 452 U.S. 692, 702, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (finding detention of an individual at his home during the execution of a search warrant is permissible because it is "substantially less intrusive" than an arrest and involves "neither the inconvenience nor the indignity associated with a compelled visit to the police station"); *United States v. Eide,* 875 F.2d 1429, 1437 (9th Cir.1989) (holding defendant was not in custody "[p]articularly because the FBI agents interviewed [him] at his home.").

**2.** The majority again attempts to distinguish a case that undermines its analysis—this time, *Palomo*—based on the fact that in *Palomo* we reviewed the district court's "in custody" determination for clear error. *Supra* at 976 n. 3. Again, to respond: the more deferential standard of review did not appear to be the decisive factor in our decision. *Palomo,* 35 F.3d at 375. Reliance on the standard of review in this situation is nothing more than a makeweight.

Furthermore, nothing in the majority's characterization of *Palomo* undermines our clear rejection of the distinction between voluntarily subjecting oneself to be interviewed and voluntarily subjecting oneself for some other reason. The "without more" language in *Palomo,* 35 F.3d at 375, does not refer to other coercive elements that make a situation custodial, as the majority seems to suggest.

Rather, *Palomo* simply rejected the defendant's argument that because he went to the police station to visit relatives—not to subject himself to an interview—he did not initiate contact with the police. Or, in other words, it takes more than approaching the police for a purpose other than speaking to them to make one's encounter with the police involuntary.

**3.** This is all the more demonstrated by the fact that months prior to the search she had received an explicit warning from DEA officers, in Korean, about the connection between sales of large quantities of pseudoephedrine and methamphetamine production. Thus, she should have had some idea as to why the police were there and that they might be interested in talking to her. Kim's status as a suspect, of course, is irrelevant to whether she was in custody. *Palomo,* 35 F.3d at 375.

## D

The fourth factor we consider is the duration of the detention. The district court found that she was questioned for approximately 45–50 minutes, but had been detained for "some time" before the interview began. The government states that the entire detention lasted about 90 minutes, which admittedly seems on the high end of our precedent.

## E

Finally, we must consider the degree of pressure applied to detain the individual. Here, Kim was neither handcuffed nor 8155 told that she was under arrest. It also appears that, at least until the interpreter arrived, Kim had a clear path of egress during the interview. While the front door was locked, it is a reasonable police procedure to control access to a scene during the execution of a search warrant. *See Booth*, 669 F.2d at 1236 ("Strong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody.");[4] *see also Summers*, 452 U.S. at 702–03, 101 S.Ct. 2587 ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.").

Furthermore, the presence of many officers conducting a search cannot alone establish a custodial situation:

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." *Any inter-view of one suspected of a crime by a police officer will have coercive aspects to it,* simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.

*Mathiason*, 429 U.S. at 495, 97 S.Ct. 711 (emphasis added). Other than the mere presence of officers, there was no pressure applied to detain Kim, even taking as true the district court's determination that no officer told her that she was free to leave.

Finally, it is significant that when the officers finished searching the store, they left without arresting Kim or her son. *See Palomo*, 35 F.3d at 375 (weighing as an important factor that the defendant "left of his own accord").

## II

I recognize that Kim was justifiably concerned about her son and worried about the presence of officers in her store. However, under the five *Hayden* factors that guide our analysis, I cannot agree that there was a "restraint on [Kim's] freedom of movement of the degree associated with a formal arrest." *Stansbury*, 511 U.S. at 322, 114 S.Ct. 1526. While the interview lasted about 90 minutes, the police did not summon Kim, she was not confronted with evidence of her guilt, she was in familiar surroundings, and the degree of pressure applied to detain her was minimal. *See Palomo*, 35 F.3d at 375 ("Although the duration of the interview and the nature of the interrogation room support Palomo's position, the remaining factors strongly support the government's contention that Palomo was not in custody."). Because I would conclude that Kim

---

4. I note that the *Booth* court found this factor important in determining whether defendant was in custody for *Fifth* Amendment purposes. Thus, the majority cannot simply rele-gate reasonable police measures designed to insure safety to the Fourth Amendment context. *Supra* at 978.

was not in custody during her presence at her store, I respectfully dissent.