M. SMITH, Circuit Judge,
concurring in the judgment:
Three California Court of Appeal justices found that Stacey Dyer was not “in custody” when she was interrogated for nearly four hours in the dead of night at a police station located thirty minutes from her home. For the reasons discussed in this concurrence, were I sitting on direct appeal in the place of one those justices, I would have decided the custody issue differently. Because the habeas appeal before us is governed by the Antiterrorism and Effective Death Penalty Act of 1996, however, I am bound by controlling law to concur in the judgment denying Dyer’s petition for relief. See 28 U.S.C. § 2254. Specifically, I am bound to concur in the judgment because we must apply a “highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.” Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam) (citation and internal quotation omitted). Moreover, I do not find that my state colleagues’ conclusion rests on an “unreasonable application of clearly *1142 established Federal law,” 28 U.S.C. § 2254(d)(1), or that the state court’s decision in this case was “so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 786-87, 178 L.Ed.2d 624 (2011). Still, I believe Dyer was entitled to the protections afforded by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The State argues otherwise, and contends that Dyer was not in custody because she: (1) agreed to travel to the police station to answer questions; (2) was permitted two unaccompanied breaks to the restroom during a nearly four-hour-long interrogation; and (3) was told once, at the very beginning of the interrogation, “And you understand that you’re not in any trouble, you’re not under arrest, and that you’re free to leave at any time?” The State puts far too much weight on each factor, while entirely ignoring the countervailing factors that support Dyer’s position.
A. Dyer’s “Voluntary” Cooperation
The State claims Dyer was not in custody because she voluntarily agreed to travel to the police station to answer questions. If Dyer did consent, this fact would be highly relevant to the custody analysis. See, e.g., Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam); California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam); but cf. United States v. Kim, 292 F.3d 969, 975 (9th Cir.2002) (“Voluntary initiation of contact with the police cannot be, under any circumstances, the end of the inquiry into whether a defendant was ‘in custody’ during [an] encounter.”). But there is simply no reason to believe Dyer truly consented to questioning here, where Detective Chapman solicited Dyer while she was already locked in the back of a police car, and had been detained there for nearly 30 minutes.
The significance of Dyer’s detention in the back of the patrol car cannot be overstated, as it serves to substantially distinguish Dyer’s case from those where suspects unambiguously volunteered to answer questions. See, e.g., Mathiason, 429 U.S. at 493, 97 S.Ct. 711; Beheler, 463 U.S. at 1122, 103 S.Ct. 3517; United States v. Crawford, 372 F.3d 1048, 1059 (9th Cir.2004) (en banc). The defendant in Mathiason, for instance, agreed to submit to police questioning after the investigating officer left his business card and a note at the defendant’s apartment asking the defendant to call him. 429 U.S. at 493, 97 S.Ct. 711. The next day Mathiason called the officer and agreed to come to the police station to answer questions. Id. That Mathiason, unlike Dyer, truly consented to questioning cannot be denied — he was under no obligation to call the officer, let alone come to the police station.
Beheler and Crawford are similarly distinguishable: In both of those cases, the defendant was in his own home when he agreed to accompany police officers to the station house. Beheler, 463 U.S. at 1122, 103 S.Ct. 3517; Crawford, 372 F.3d at 1051. This distinction is critical because a suspect is far less likely to be intimidated or coerced into talking to the police when she is in the familiar surroundings of her own home. United States v. Craighead, 539 F.3d 1073, 1083 (9th Cir.2008) (“The element of compulsion that concerned the Court in Miranda is less likely to be present where the suspect is in familiar surroundings.”) (citation omitted). That suspects like those in Beheler and Crawford can, at least theoretically, ask the police to leave their property is highly significant in evaluating the ultimate voluntariness of their decisions to cooperate with the au *1143 thorities. See generally id. at 1083-84 (noting that “courts have generally been much less likely to find that an interrogation in the suspect’s home [is] custodial in nature.”) (citations omitted).
In contrast to the suspects in Mathiason, Beheler and Crawford, Dyer’s “consent” was obtained while she was already under total police control. Thus for Dyer, refusing the police’s invitation would have required more than simply asking the police to leave or not phoning back, but affirmatively convincing the police to release her from the back of the locked squad car. And even then, Dyer may not have been “free to leave” because the police could have denied her entry to her apartment until their ongoing search for evidence was complete. See, e.g., Illinois v. McArthur, 531 U.S. 326, 332, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (holding that the police may reasonably deny a suspect entry to his own home to prevent the destruction of evidence). As we have recognized, “[t]o be ‘free’ to leave is a hollow right if the one place the suspect cannot go is his own home.” Craighead, 539 F.3d at 1083. A reasonable person in Dyer’s position — already removed from her home and detained in a locked police vehicle around 11:00 P.M. — would likely have felt that a trip to the police station was inevitable, and certainly would not have felt free to refuse the police’s request to talk.
B. Dyer’s Capacity to Leave
The State next argues that Miranda warnings were unnecessary because Dyer was permitted two unaccompanied breaks to the restroom during her lengthy interrogation. Specifically, the State argues that because Dyer could have exited the police station (mid-interview) out of an unlocked side door, she was not in custody. The State’s argument misses the mark for several reasons.
First, there is no evidence that Dyer (or a reasonable person in Dyer’s position) actually knew she could exit the station house.[1] But even assuming Dyer knew she could leave, she had nowhere to go— Dyer was questioned between midnight and 4 a.m., a 30 minute drive from her home, and without any means of transportation. Although similar in some ways, Fresno is not Manhattan, where taxis and buses run all night and residents can reasonably hope to obtain a safe ride home.[2] The State’s claim that a female suspect, under the circumstances here, stranded far from her home in the dead of night would simply walk out of a police interview strains credulity, even if the front door was wide open.
More importantly, however, the fact that Dyer theoretically could have exited the station is largely irrelevant. Whether Dyer was confined in a labyrinthine prison or a minimalist station house, the question is not whether a suspect was theoretically capable of leaving, but whether a reasonable person in the suspect’s position would have felt free to leave. Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Here, for the reasons already indicated (i.e., the lateness of the hour, the distance from her home, and her lack of transportation), Dyer was not free to leave. And if this conclusion were in *1144 any doubt, the fact that Chapman and his partner had spent nearly two hours accusing Dyer of murder before she was allowed to take her first break confirms it. See Kim, 292 F.3d at 974 (finding “the extent to which the defendant is confronted with evidence of guilt” highly relevant to the Miranda determination). Before stopping around 2 a.m., the detectives had already told Dyer, among other things, that: “people have picked you out of a line-up, they know it was you”; “you have been implicated in this crime, and we just need to know the story”; “what they’re saying is that you guys are responsible for DJ’s death”; “you were handed the weapon and they told you to do it”; and “you’ve been implicated as being responsible for the death of D.J., and it’s very serious.” Confronted with such momentous allegations of guilt, no reasonable person would have felt free to turn an unaccompanied trip to the restroom into a full-blown escape attempt.
C. Advisement Dyer Was Free to Leave
Finally, the State argues that Dyer was not in custody because the detectives told her once, before the interview began, that “you’re not in any trouble, you’re not under arrest, and that you’re free to leave at any time.” As the majority properly recognizes, such an advisement is extremely relevant, and we have previously held that the fact that the “[djefendant was expressly told that he was not under arrest” is “most significant for resolving the question of custody[.]” Crawford, 372 F.3d at 1059-60. Still, “the mere recitation of the statement that the suspect is free to leave or terminate the interview ... does not render an interrogation non-custodial per se.” Craighead, 539 F.3d at 1088; see also United States v. Brown, 441 F.3d 1330, 1347 (11th Cir.2006) (“There may be situations where the restraints placed on a suspect’s freedom are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview[.]”) (citation omitted). Rather, to determine whether Dyer was in custody we must again consider whether a reasonable suspect would have felt at liberty to terminate the interview and leave. Craighead, 539 F.3d at 1088. Again, the answer is no.
Dyer concedes that Chapman told her that she was “free to leave,” and the transcript confirms that Dyer acknowledged Chapman’s statement.[3] Nevertheless, several facts lead me to conclude that Dyer could have reasonably believed she was not free to leave, notwithstanding that Detective Chapman told her she was. For instance, immediately prior to Chapman’s advisement, Dyer had been detained in the back of a police vehicle for roughly one hour in the aggregate, and had witnessed Sheriffs Deputies search her home. Thus, by the time the interview started, Dyer certainly knew that the police considered her a suspect in a criminal investigation, and given the night service of the search warrant and the unusual hour of the interview itself, Dyer surely knew the crime being investigated was quite serious. See generally Rodriguez v. Superior Court, 199 Cal.App.3d 1453, 245 Cal.Rptr. 617, 624-25 (1988) (describing the heightened standard for obtaining nighttime service of a search warrant); see also CaLPenal Code § 1533. At the very outset of the interrogation then, Chapman’s assurance that Dyer was “free to leave at any time” likely rang false.
But even assuming that a reasonable person in Dyer’s position would have initially believed that she was free to leave, *1145 there is no reason to suspect that such a belief would have persisted throughout the entirety of the interview. See, e.g., Crawford, 372 F.3d at 1061 (holding that a suspect was not in custody where he was “repeatedly told” that he was not under arrest and was free to leave) (emphasis added). Within minutes of telling Dyer she was free to leave, detectives informed her that “you’ve been implicated by several people as being involved in this, and that’s why we’re here tonight.” By the time an hour had elapsed, the police had made at least 20 more references to Dyer’s involvement in D.J. Hunter’s death. Put simply, well before Dyer made any incriminating statements, a reasonable person in her position would have known that, despite Chapman’s earlier assertion, she was not free to leave. Thus, Dyer was “in custody” and was entitled to receive Miranda warnings.

. The majority notes that "nothing in the record suggests that the detectives did anything to heighten [Dyer’s] sense of seclusion." While true, there is similarly nothing in the record to suggest that Dyer knew she could easily leave.

. There is nothing new about considering geography when determining the appropriate level of constitutional protection. For example in Illinois v. Wardlow, the Supreme Court found particularly relevant the fact that the defendant took flight in an “area known for heavy narcotics trafficking.” 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

. “Q: Ok. And you understand that you’re not in any trouble, you’re not under arrest, and that you’re free to leave at any time? A: Uh huh (affirmative).”