IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | | |
|---|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68106-1-I | |
| | ) | | |
| Respondent, | ) | | |
| | ) | DIVISION ONE | |
| v. | ) | | |
| | ) | UNPUBLISHED OPINION | |
| JOSE HERNANDEZ-GARCIA, | ) | | |
| AKA JESUS HERNANDEZ-GARCIA, | ) | | |
| | ) | | |
| Appellant. | ) | FILED: April 29, 2013 | |

GROSSE, J. — An individual is "in custody" for the purposes of Miranda v. Arizona,[1] when a reasonable person would have felt that he or she was not free to end the interrogation and leave. Here, Jose Hernandez-Garcia agreed to speak with detectives, who told him that he was not under arrest. Shortly into the conversation, he volunteered incriminating information. Under these circumstances, the interrogation was noncustodial. We affirm.

FACTS

On the morning of December 2, 2010, Seattle Police Detective Leslie Smith arrived at Ross Display to contact employee Hernandez-Garcia regarding allegations of child sexual abuse made against a man known as "Muchacho." Smith suspected that Hernandez-Garcia was "Muchacho," and she hoped to verify Hernandez-Garcia's identity and to talk with him if he was willing.

After speaking with Hernandez-Garcia for a short while, Smith realized that she needed the assistance of an interpreter due to Hernandez-Garcia's limited ability to speak English. Smith gave Hernandez-Garcia her card, which indicated that she

---

[1] 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

worked for the Seattle Police Department's sexual assault unit. Hernandez-Garcia agreed to speak with her the following week.[2]

On December 9, Smith returned to Ross Display with Detective Susana Ditusa and a Spanish-language interpreter. The detectives were armed but dressed in plain clothes and were driving an unmarked car. Once inside, Smith told a supervisor that they wanted to meet with Hernandez-Garcia privately, and he showed them to a 12-foot by 13-foot employee break room in the back of the building. The supervisor retrieved Hernandez-Garcia, who agreed to a recorded conversation with the detectives.

Smith closed the door to the room and questioned Hernandez-Garcia for a little over an hour. First, Smith verified that Hernandez-Garcia was also known by the nickname "Muchacho." She informed him that the complainant, E.P., had alerted employees at her school as to "what had gone on between you and her a couple of years ago."[3] After telling him, "[i]t's pretty serious why we're here," she stated, "we're not here to take you to jail. . . . But I am here to try to find out the truth of what happened between you and [E.P.]." Hernandez-Garcia replied, "Oh okay. Like—." The following exchange then occurred:

> DETECTIVE: Like okay. What [E.P.] admitted to, and kept—she kept hidden for a long time.
> HERNANDEZ-GARCIA: Uh, huh.
> DETECTIVE: But as she got older, now that she's in second grade, she's been able to actually verbalize to tell people what had happened. She admitted to something that went on between the two of you that's pretty intimate. Do you understand when I say intimate what I mean by that?
> HERNANDEZ-GARCIA: Yes, but it surprises me.

---

[2] According to Smith, she and Hernandez-Garcia understood each other well enough to make these arrangements.

[3] E.P. was the daughter of a friend of Hernandez-Garcia, who cooked meals out of her home.

DETECTIVE:Okay. Um, let me just tell you what she said. That you didn't just watch movies when you were sitting on the couch.
HERNANDEZ-GARCIA: Uh, huh.
DETECTIVE:And that you did private things with her.
HERNANDEZ-GARCIA: No, but like what?
DETECTIVE:Like private things that you touched her privates, and that you had her touch yours.
HERNANDEZ-GARCIA: I'll have to start from the beginning to explain this.
DETECTIVE: Okay. Please do.

Hernandez-Garcia told Smith that E.P., who was four years old at the time of the events, had a habit of grabbing his penis over his clothes, and that he tried to discourage this behavior. He said he never touched E.P. in return. He also denied E.P.'s accusations that he had shown her pornographic movies on a portable DVD (digital versatile disc) player.

For most of the interview, Hernandez-Garcia continued to deny E.P.'s accusations that he inappropriately touched her. Smith eventually told him, "little girls don't make things like that up." She said, "We're not here because we think you're some sort of monster and you're out there preying on little girls." Rather, "I think you just made a mistake. . . . [W]e're just here talkin' to you right now because we're tryin' to find out the truth." Hernandez-Garcia eventually admitted to the conduct. At the end of the interview, Smith arrested him and informed him of his rights.

The State charged Hernandez-Garcia with first degree rape of a child, first degree child molestation, and communication with a minor for immoral purposes.

Hernandez-Garcia sought to exclude the statements he made to Smith during the Ross Display interview, claiming that Smith should have provided him with Miranda warnings. The court held a CrR 3.5 hearing to determine the admissibility of the statements. After considering testimony from Smith, Ditusa, and the interpreter, the

court ruled that the statements were admissible. After a trial, during which the recording of the interview was played for the jury, Hernandez-Garcia was convicted on all counts. He appeals.

## ANALYSIS

Hernandez-Garcia contends the trial court should have suppressed his statements, claiming they were made during a custodial interrogation that required Miranda warnings. Under Miranda, evidence obtained as a result of a custodial interrogation may not be used against a defendant unless the defendant was first warned of his or her rights.[4] Here, it is undisputed that Hernandez-Garcia was interrogated.[5] Thus, if Hernandez-Garcia was in custody at the time the interrogation occurred, his statements should have been suppressed. "We review a trial court's custodial determination de novo."[6]

"'Custody' for the purposes of Miranda is narrowly circumscribed and requires formal arrest or restraint on freedom of movement to a degree associated with formal arrest."[7] This court employs an objective standard: "whether a reasonable person in the individual's position would believe he or she was in police custody to a degree associated with formal arrest."[8] A defendant must point to "objective facts indicating his or her freedom of movement was restricted."[9] To determine whether an interrogation was custodial, a court must examine all the circumstances surrounding the

---

[4] State v. Baruso, 72 Wn. App. 603, 609, 865 P.2d 512 (1993).
[5] "Interrogation" occurs when the interviewing officer should have known that the questioning would provoke an incriminating response. State v. Post, 118 Wn.2d 596, 606, 826 P.2d 172 (1992).
[6] State v. Lorenz, 152 Wn.2d 22, 36, 93 P.3d 133 (2004).
[7] State v. Ferguson, 76 Wn. App. 560, 566, 886 P.2d 1164 (1995).
[8] Lorenz, 152 Wn.2d at 36-37.
[9] Post, 118 Wn.2d at 607.

4

interrogation.[10] "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning."[11]

Hernandez-Garcia argues that the interrogation was custodial because he was isolated from others, did not initiate contact with the officers, was outnumbered by law enforcement personnel, and was not explicitly informed that he could end the interview and leave. Although he was not bound or otherwise physically restrained, he contends that closing the door to the interview room was a kind of psychological restraint. He claims that the officer's repeated accusations led to a coercive environment in which he felt pressured to make incriminating statements. We disagree.

Several other considerations lead us to the conclusion that the interrogation was noncustodial. Hernandez-Garcia voluntarily agreed to speak with Smith on two separate occasions with the understanding that questioning would result. Also, Smith told Hernandez-Garcia at the beginning of the interview that she was not there to arrest him. While Smith did not explicitly tell Hernandez-Garcia that he was free to go, that fact is fairly implied based on these circumstances—particularly Hernandez-Garcia's agreement to talk and Smith's statement that she was "not [t]here to take [him] to jail." The interview was held in a familiar setting—the employee break room. The room had two exits, and there is no evidence that either one was blocked. Also, Hernandez-

---

[10] Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)).
[11] Howes v. Fields, 132 S. Ct. 1181, 1189, 182 L. Ed. 2d 17 (2012) (citations omitted).

Garcia never attempted to leave or end the interview. Rather, he volunteered to explain the situation to the detectives shortly after the interview began.

The cases Hernandez-Garcia relies upon— State v. Dennis,[12] United States v. Kim,[13] and United States v. Carter[14]—are distinguishable.

In Dennis, Division Two of this court held that the defendants were in custody when a police officer interrogated them in their own home, even though they were not placed under arrest and the officer told them they were free to leave at any time.[15] There, the atmosphere was "dominated by the officer's unwelcome presence," the officer insisted on remaining in a position where he could monitor and restrict the defendants' freedom of movement within their home, and the officer informed the defendants that a search warrant had been obtained and was en route to the apartment in order to be served.[16]

In Kim, the defendant and her husband drove to the store they owned to check on their son after a police officer showed up at their house looking for him.[17] When they arrived, the police were executing a search warrant and the door to the store was locked.[18] Kim knocked, and an officer let her enter but locked out her husband.[19] Kim was not allowed to leave for three hours.[20] Once she entered the store, officers prevented her from speaking with her son and ordered her to speak English, not her

---

[12] 16 Wn. App. 417, 558 P.2d 297 (1976).
[13] 292 F.3d 969 (9th Cir. 2002).
[14] 884 F.2d 368 (8th Cir. 1989).
[15] Dennis, 16 Wn. App. at 421-22.
[16] Dennis, 16 Wn. App. at 421-22.
[17] Kim, 292 F.3d at 971.
[18] Kim, 292 F.3d at 971.
[19] Kim, 292 F.3d at 971.
[20] Kim, 292 F.3d at 971.

native Korean.[21] Kim was directed to sit while the officers searched the store for "some time."[22] After that, they interrogated her for 30 minutes without an interpreter and another 20 minutes after the interpreter arrived.[23] Kim said that the officers positioned themselves so that she felt "surrounded."[24] During the questioning, Kim admitted to selling large quantities of pseudoephedrine.[25] The court held that under these circumstances, Kim was sufficiently restrained so as to be considered in custody.

In Carter, the Eighth Circuit held that the defendant was in custody where postal inspectors and a bank security officer surrounded him during the interrogation, the inspectors did not tell him he was free to leave or did not have to answer their questions, and the inspectors adopted a "Mutt and Jeff" approach during the hour-long interview, confronting him with damning evidence of his guilt.[26]

In each of these cases, there is an element of police dominance and restraint that is absent here. The detectives did not surround Hernandez-Garcia or otherwise restrict his freedom of movement, engage in deceptive interrogation tactics, or threaten him with the existence of a search warrant. Unlike Kim, Smith did not prevent Hernandez-Garcia from speaking in his native language; she waited until an interpreter was present to question him. These circumstances distinguish this case from those Hernandez-Garcia relies upon.

---

[21] Kim, 292 F.3d at 971. Another officer told her to "shut up."
[22] Kim, 292 F.3d at 971-72, 977.
[23] Kim, 292 F.3d at 977.
[24] Kim, 292 F.3d at 972.
[25] Kim, 292 F.3d at 972.
[26] Carter, 884 F.2d at 372 (1989).

CONCLUSION

Smith told Hernandez-Garcia that she was not at his workplace to take him to jail and asked him if he would agree to speak with her. Hernandez-Garcia voluntarily did so. A reasonable person in Hernandez-Garcia's position would not have felt his freedom of movement was restricted to a degree associated with formal arrest. We affirm.

WE CONCUR: