**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | No. 11-10317 |
| v. | D.C. No. 4:10-cr-02378-CKJ-CRP-1 |
| IMM, JUVENILE MALE, *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted
February 12, 2013—San Francisco, California

Filed March 31, 2014

Before: Dorothy W. Nelson, Stephen Reinhardt,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Reinhardt

# SUMMARY[*]

## Criminal Law

The panel reversed a criminal judgment and remanded in a case in which a juvenile was convicted of sexually abusing his six year old cousin.

Rejecting the defendant's contention that the district court lacked jurisdiction, the panel held that the government met the requirements of 18 U.S.C. § 5032 by certifying that "the juvenile court or the state does not have jurisdiction over the juvenile with respect to the alleged act of juvenile delinquency," even though the certification was missing a page and did not include a statement of the government's substantial federal interest in this case.

The panel held that the district court did not err in allowing a seven year old child to testify. Regarding the defendant's argument that the government failed to prove beyond a reasonable doubt that the defendant penetrated the victim's anus, the panel held that the evidence at trial, including the defendant's inculpatory statements, was not insufficient to support the conviction.

The panel reversed and remanded because the defendant's inculpatory statements should have been suppressed, where the defendant, who was not Mirandized, was "in custody" while questioned by a detective.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jill E. Thorpe (argued), Tucson, Arizona, for Defendant-Appellant.

John S. Leonardo, United States Attorney, District of Arizona; Christina M. Cabanillas, Appellate Chief; and Raquel Arellano (argued), Assistant United States Attorney, for Plaintiff-Appellee.

**OPINION**

REINHARDT, Circuit Judge:

IMM, a juvenile, appeals his conviction under 18 U.S.C. §§ 2241 and 2246 for sexually abusing his six year old cousin. To convict him of sexual abuse, the government had to prove beyond a reasonable doubt "contact between the penis and the vulva or the penis and the anus," with "contact" defined as "penetration, however slight." § 2246(2)(A). We conclude that the government's jurisdictional certification under 18 U.S.C. § 5032 was sufficient, that the district court did not err in admitting the testimony of a seven year old witness, and that the evidence introduced at trial was sufficient to support the conviction. We reverse and remand to the district court, however, because we conclude that it erred when it admitted into evidence an inculpatory statement obtained from IMM in violation of his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

**BACKGROUND**

**I**

IMM, his female cousin MM, and her younger brother were playing outside their grandfather's trailer on an Indian reservation in Arizona.  IMM was twelve years old, MM was six years old, and her brother was five years old.  At some point in the afternoon, their grandfather went to check on them and found MM standing in front of the boys with her pants down.  He yelled at her and asked "what the hell they were doing," to which she replied, "They told me to take my clothes off."  The boys were sitting next to each other on a propane tank and both of them had their clothes on.  Their grandfather started cursing.  Although MM had shown no signs of distress when her grandfather first arrived, she started crying after he began yelling at her.  He then marched into the house to tell MM's mother what he had seen.

There is conflicting testimony as to what happened next.  The children's grandfather testified that MM's mother was asleep when he found her in the house, and that he woke her up and said, "You are not even watching your kids and this is what they are doing.  [MM] is over there without her clothes in front of the boys."  He also testified that she then called her children and started "beating [MM's brother]" when he ran into the house.  He added that, after beating her son, she went looking for MM and spanked her too, and that, later that evening, IMM was taken by another family member over to the house of his great aunt.

MM's mother offered a somewhat different account of the events at trial.  In her telling, the children's grandfather found her in the house "changing [her] printer for [her] camera" and

said "[t]hat [IMM] was doing something to [MM], and to go check on them." She recalls that MM's brother came into the house and said, "[IMM] did it," at which point she walked through the house until she found MM, who "had her head down, and . . . was crying." She specifically denies spanking either of her children. She remembers that instead, she immediately went looking for IMM, and that "she started yelling for him, [screaming] that I was going to call the police." Unable to find him, she then discovered MM in the closet, crying. She reports that she asked MM if IMM had done anything to her and MM nodded. At trial, she initially testified several times that this was all that had happened, but then stated after further questioning by the prosecutor that MM had also said that "[IMM] made her do it."

MM's mother did not check MM for any physical signs of sexual assault, or ever take her to the hospital or the police station for a physical examination. MM did not ever complain of any pain; nor did her mother ever ask her any questions about what IMM did to her. Instead, MM's mother testified that she called the police right away. Although the disputed events occurred before sunset and before dinner, and although she testified that her family usually eats dinner before 6:00 p.m., the police report states that she first spoke to the police at 8:00 p.m. that night. She was not on speaking terms with the children's grandfather or IMM's mother at the time, and for that reason did not speak with either of them about what had happened.

MM's younger brother also testified at the trial. Before he testified, however, defense counsel requested that a hearing be held to evaluate whether he was competent to testify. He was five years old when he purportedly witnessed the incident and was seven years old at the time of the trial.

The district judge asked him several questions about "the difference between . . . telling the truth, and telling a lie." After some initial confusion, he correctly answered a series of questions about whether it would have been the truth or a lie for him to make certain statements. Although he was not sure what would happen if he told a lie, he answered "Yes" when asked, "Do you understand how important it is for you to tell the truth today?" He also answered "Yes" when asked, "And do you know that you could get in trouble if you didn't tell the truth?" Later in the hearing, in response to questions from defense counsel, he confused a "promise" with a "secret." After the district judge questioned him further, however, he demonstrated that he understood the concept of a promise. The court made a preliminary determination that he was competent to testify and later made that determination final.

MM's younger brother testified that he had seen MM and IMM "having sex." When asked what this meant, he reiterated that they were "having sex" and then admitted that he did not know what "having sex" meant or where he had heard these words before. He stated that, on the day of the purported incident, MM had been sitting on IMM's lap, that both of their pants had been pulled down, and that MM had been facing away from IMM while she sat on his lap. He added that he had seen IMM's "dingamajiger," though he could not remember what color or size it was, and that IMM had put his dingamajiger in MM's "private," the part that "poops." On cross-examination, when asked, "Do you remember the day that you were just talking about?", he answered, "No." He then answered "I don't know" when asked how he could talk about events he did not remember. When defense counsel asked if someone had talked to him about the incident and told him what to say, he said yes and

stated that his mother had told him what to say. When she testified, his mother stated that she had never spoken with him about what he saw or what had happened that day, and that she had never told him what to say in IMM's case. She then asserted that his statement to the contrary was a lie.

## II

The police did not interview IMM until more than seven months after the incident under investigation.[1] A detective, who was in plain clothes but visibly armed, drove to IMM's home and transported him and his mother to the police station in an unmarked car.[2] The drive lasted 30 to 40 minutes. At the police station, which was staffed by uniformed police officers, the detective escorted IMM and his mother into a small room about five or six feet by five or six feet—just big enough for a small desk, approximately four chairs, and a recording device. The detective closed the door and kept it closed the entire time he was with IMM (including the brief period he was with IMM and his mother).[3]

---

[1] The police first interviewed the children's grandfather three weeks after the incident. Forensic interviewers took a statement from MM two weeks later and one from her younger brother two months after that.

[2] The detective testified that he did so because IMM and his mother lacked transportation. There is no evidence as to whether IMM understood that this was why a police officer had shown up at his house and escorted him and his mother to a police station in an unmarked car.

[3] Although the detective testified that the door was unlocked, there is no evidence that IMM was aware of this fact. The detective never told IMM anything about the closed door.

The detective testified that he did not read IMM his rights under *Miranda*. Nor, he admitted, did he have IMM sign a consent form. Instead, he read the Parental Consent to Interview a Juvenile Form to IMM's mother and had her sign it. Although IMM was sitting in the room at the time, the detective read the Parental Consent to Interview a Juvenile Form to his mother, and no evidence was offered that IMM was listening to the reading of the Form or that he understood its contents. His mother signed the Form and agreed to wait in the lobby because she thought the detective "would treat [IMM] like a child." The detective ordered IMM to wait in the room while he escorted IMM's mother to the lobby, leaving the door shut. When he returned, the detective said to IMM, "I read your mom those rights, okay, so at any time throughout the, the interview you don't feel comfortable, you can stop and you don't have to answer any questions." The detective then asked if IMM understood and IMM replied, "Uh-huh."

IMM was twelve years old at the time of the interview, though the detective later testified that IMM "looked a little younger." As IMM's mother noted at the suppression hearing, IMM had been in special education classes and could read only at a second grade level, even though he was in sixth grade. IMM also had emotional problems stemming from his troubled home life. He had witnessed his father try to kill his mother and may have been sexually abused by his father. IMM's mother testified that IMM's grandfather, who found the children outside his trailer, was "the only positive [] male role model" in IMM's life and that IMM called him "dad." She added that IMM and his grandfather were "pretty close."

The detective had no special training in conducting interviews with juveniles or juvenile suspects. He also

testified, remarkably, that he had never heard of false confessions. He added that he saw no problem with an officer, in an interrogation, telling a young child with special education needs what the officer would like that child to say.

The detective spent 55 minutes questioning IMM, beginning his questioning by asking IMM basic identifying information. IMM did not know his own address. The detective then pressed IMM for details on what had happened with his cousins outside his grandfather's trailer. At first, and for nearly half of the interrogation, IMM denied that any sexual conduct had occurred. He explained repeatedly that he had kept his pants on when MM sat on his lap. He also said "I don't know" and "I don't really remember" in response to several questions.

The detective responded by using what he later described as "deception." Even though IMM's grandfather did not, in fact, see IMM do anything improper, the detective repeatedly insisted to IMM that his grandfather had seen IMM sexually abuse MM. The detective lied to IMM, insisting that his grandfather had said he "saw [IMM] touching [MM]." When IMM disagreed, the detective asked questions such as, "Would you consider your grandpa a liar?", and reminded IMM that "we've already made the decision that grandpa doesn't lie right?" Even as he told IMM that his grandfather had reported abuse and implied that any disagreement meant that IMM thought his grandfather was a liar, the detective warned IMM: "[T]his isn't really a big thing but it can turn into a big thing if you're not going to be honest." He added, "I don't want to go over[,] well, I don't remember or uh, this is what happened[,] because I know what happened because I talked to people who saw it, who know, who have heard." When IMM again recounted what happened and maintained

that he had not abused MM, the detective sharply interrupted him and said "No, no . . . remember, we talked about being truthful?  Grandpa saw more than you think he saw." Minutes later, when IMM said "I wasn't doing nothing," the detective responded: "Yeah, you were doing something. Because grandpa tells me you were doing something and [MM's brother] said he saw what you were doing.  So both of them are liars?"  IMM replied "[Her brother] lies," leading the detective to return to his deception involving the grandfather: "[W]ell then, well, grandpa doesn't lie and grandpa told me the exact same thing that [MM's brother did]."

Halfway through the interrogation, the detective said that MM's brother had told him that "you're putting your weenie in her butt."  This was the first time either party to the interview had used the words "weenie" and "butt."  IMM replied, "I know."  The detective then told IMM that "grandpa said he saw you touching her . . .  I'm not here making things up to you okay."  When the detective asked, "We know [MM] got on top of you, I want to know what you did," IMM repeated the language used by the detective: "Um, um, put my, put my weenie in her butt I guess."  When the officer asked IMM to clarify what part of the body he meant, he said "weenie" meant "balls."  After some follow-up questions from the detective, IMM clarified that he was talking about his "middle part" that he uses to "pee." Prodded by detailed and leading questions from the detective, IMM thereafter confessed to telling MM to take off her clothes and to sit on top of him, and he stated that he "um, put [his] weenie in her butt or something."

Before trial, IMM's lawyer filed motions to suppress the inculpatory statement on grounds of coercion and a *Miranda*

violation.  After a suppression hearing, the district court concluded that the statement was admissible and did not violate *Miranda* because IMM had not been in custody when the statement was made and the statement had been given voluntarily.

## DISCUSSION

## I

IMM contends that the government submitted a deficient certification under 18 U.S.C. § 5032 and that the district court therefore lacked jurisdiction.[4]  We conclude that the certification that the government filed in the district court met the requirements of § 5032 by certifying that "the juvenile court or the state does not have jurisdiction over the juvenile with respect to the alleged act of juvenile delinquency," even though it was missing a page and did not include a statement of the government's substantial federal interest in this case.

To prosecute a juvenile in federal court, the government must satisfy the certification procedures set forth by § 5032. *United States v. Doe*, 170 F.3d 1162, 1165 (9th Cir. 1999). Specifically, the government must certify that

> (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of

---

[4] "Whether the government complied with 18 U.S.C. § 5032 is an issue of statutory interpretation which this court reviews de novo." *Juvenile Male (Kennetch C.)*, 241 F.3d 684, 686 (9th Cir. 2001) (citing *United States v. Doe*, 98 F.3d 459, 460 (9th Cir. 1996)).

juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony or an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), or section 1002(a), 1003, 1005, 1009, or 1010(b)(1), (2), or (3) of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 953, 955, 959, 960(b)(1), (2), (3)), section 922(x) or section 924(b), (g), or (h) of this title, and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.

§ 5032. "Certification is a jurisdictional requirement." *Doe*, 170 F.3d at 1165 (citing *United States v. Doe*, 98 F.3d 459, 460 (9th Cir. 1996)); *see also United States v. Juvenile Male (Kenneth C.)*, 241 F.3d 684, 686 n.1 (9th Cir. 2001) ("A district court cannot entertain a juvenile delinquency action unless the § 5032 certification is properly filed."). The purpose of § 5032 is "to help ensure that state and local authorities . . . deal with juvenile offenders wherever possible, keeping juveniles away from the less appropriate federal channels." *United States v. Juvenile Male*, 864 F.2d 641, 644 (9th Cir. 1988).

In this case, the government, apparently inadvertently, omitted the second page of its certification from its filing. On the first page of the document that it filed, the government certifies that "the juvenile court or the state does not have jurisdiction over the juvenile with respect to the alleged act of juvenile delinquency" and that "the offense charged is a crime of a violence." The third page contains the signature of

the United States Attorney, as required by our precedent. *See Doe*, 98 F.3d at 460–61. The certification does not contain any statement regarding the government's substantial federal interest in this case that warrants the exercise of federal jurisdiction over IMM.

Conceding that the certification therefore does not satisfy the third provision of § 5032, the government argues that it nonetheless satisfies the statute's first provision.[5] In response, IMM does not dispute that the filing adequately certifies that "the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency."[6] Instead, he contends that § 5032 requires the government also to certify a substantial federal interest in jurisdiction over IMM. This argument raises a question of first impression: whether the requirement to

---

[5] As we have explained, "[c]ertification under any one of the three provisions of Section 5032 is sufficient to commit a juvenile to the federal court system." *United States v. Male Juvenile (Pierre Y.)*, 280 F.3d 1008, 1014 (9th Cir. 2002) (citation omitted); *see also Juvenile Male*, 864 F.2d at 646 ("[T]he certification list in section 5032 is disjunctive."). Further, in light of this concession by the government, we need not reach IMM's argument that 18 U.S.C. § 2241 is not a "crime of violence" within the meaning of § 5032.

[6] IMM suggests that the missing page should wholly disqualify the government's certification. It is settled, however, that "[i]n applying § 5032, federal courts 'refuse to elevate form over substance.'" *Doe*, 170 F.3d at 1165 (quoting *United States v. White*, 139 F.3d 998, 1002 (4th Cir. 1998)). Here, IMM does not offer any reason to suspect that the missing second page would have contradicted or withdrawn the government's statement on the first page that "the juvenile court or the state does not have jurisdiction over the juvenile with respect to the allaged act of juvenile delinquency." We therefore reject this argument.

certify a substantial federal interest is an independent requirement that applies to each of the bases for jurisdiction set forth in § 5032 or is required only when the government asserts jurisdiction under this statute's third provision.[7]

The text of § 5032 lends support to each of these positions. It suggests that certification of a substantial federal interest is an independent requirement in two ways: first, by introducing the requirement with "and that," implying that it is distinct from the other three provisions, which are collectively introduced with a requirement that the government "certifies to the appropriate district court of the United States that"; and second, by setting off this requirement with a comma after the third provision. However, the plain text can also be fairly read to suggest that certification of a substantial federal interest is required only under § 5032's third provision: first, the far more natural method of designating it as an independent requirement would have been to list it before the three provisions, rather than as an addendum to the third provision; and second, the commas that set it off from the third requirement serve to separate the various sections of the federal controlled substances laws, not to indicate that the substantial federal interest requirement is meant to apply to all three of the foregoing provisions.

---

[7] None of our precedents has decided this issue directly. Describing the requirements of § 5032, however, we have characterized the substantial federal interest requirement in somewhat different ways. *Compare United States v. Juvenile Male*, 595 F.3d 885, 887 (9th Cir. 2010), *with United States v. Male Juvenile*, 280 F.3d at 1014, *and Juvenile Male*, 864 F.2d at 646.

Legislative history resolves this textual ambiguity and makes clear that Congress intended the "substantial Federal interest" requirement to apply to (and limit) only the third basis for jurisdiction under § 5032. *See In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1180–81 (9th Cir. 2013) ("Where the statutory text is ambiguous . . . we may 'look to other interpretive tools, including the legislative history' in order to determine the statute's best meaning." (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 567 (2005))). Congress added the third provision of § 5032 and the "substantial Federal interest" language together in 1984.[8] The accompanying Senate report explained that this amendment "would allow retention of Federal jurisdiction over a juvenile offender on the basis of a substantial Federal interest in the offense charged . . . ." S. Rep. No. 225, 98th Cong., 1st Sess. 386, 387. The report added that the newly-added third provision was meant to give the federal

---

[8] Before the 1984 amendments, § 5032 provided:

> A juvenile alleged to have committed an act of juvenile delinquency shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to an appropriate district court of the United States that the juvenile court or other appropriate court of a state (1) does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, or (2) does not have available programs and services adequate for the needs of juveniles.

> If the attorney general does not so certify, such juvenile shall be surrendered to the appropriate legal authorities of such state.

Pub. L. 93–415, September 7, 1974, 88 Stat 1109.

government power to retain jurisdiction even when a state was willing to assume jurisdiction in certain serious felony cases:

> [T]he Committee has added a third category to existing law that would permit the disposition of a case involving a juvenile charged with a serious felony by means of a Federal proceeding.   This would be permissible if the Attorney General certifies that the offense is a felony crime of violence 7 or a serious drug offense described in 21 U.S.C. 841, 952(a), 955, or 959, and that there is a "substantial Federal interest in the case or offense to warrant the exercise of Federal jurisdiction."

*Id.* at 389.   The report said nothing about applying the new "substantial federal interest" requirement to limit federal jurisdiction under the preexisting first and second provisions of § 5032, and Congress's purpose in adding the third provision and the substantial federal interest requirement does not suggest a reason to do so.

Accordingly, we hold that the requirement that the government certify a "substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction" applies only to the third provision of § 5032.[9]  Applying that rule to this case, we conclude that the certification here

---

[9] The Fourth Circuit has described the requirements of § 5032 in a manner consistent with our holding. *United States v. T.M.*, 413 F.3d 420, 424 (4th Cir. 2005).

satisfied the requirements of § 5032 and that the district court had jurisdiction over IMM.

## II

IMM argues that the district court erred in refusing to suppress his inculpatory statement under *Miranda*. *Miranda* is violated when a suspect is placed in custody and is then interrogated without receiving *Miranda* warnings or without knowingly, intelligently, and voluntarily waiving the rights described in those warnings.

"Any police interview of an individual suspected of a crime has coercive aspects to it." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401 (2011) (quotation marks and citations omitted). When police conduct results in an individual being placed "in custody," the substantial coercion inherent in his situation "blurs the line between voluntary and involuntary statements, and thus heightens the risk that [the person being interrogated] will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (quoting *Miranda*, 384 U.S. at 439). "Custodial police interrogation, by its very nature, isolates and pressures the individual, and there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed." *Corley v. United States*, 556 U.S. 303, 320–21 (2009) (quotation marks and citations omitted). "[T]hat risk is all the more troubling—and recent studies suggest, all the more acute—when the subject of custodial interrogation is a juvenile." *J.D.B.*, 131 S. Ct. at 2401 (citing an amicus brief collecting studies that "illustrate the heightened risk of false confessions from youth"). As the Supreme Court long ago

recognized, circumstances that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Haley v. Ohio*, 332 U.S. 596, 599 (1948) (plurality opinion).

Recognizing that the inherently coercive nature of custodial interrogation calls into doubt the voluntariness of inculpatory statements, the Court in *Miranda* "adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination." *J.D.B.*, 131 S. Ct. at 2401 (quoting *Dickerson*, 530 U.S. at 435). These rules "give force to the Constitution's protection against compelled self-incrimination," *Florida v. Powell*, 559 U.S. 50, 59 (2010), and require that, before custodial interrogation, a suspect be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," *Miranda*, 384 U.S. at 444. "[I]f a suspect makes a statement during his custodial interrogation, the burden is on the Government to prove, as a 'prerequisit[e]' to the statement's admissibility as evidence in the Government's case in chief, that the defendant 'voluntarily, knowingly and intelligently' waived his rights." *J.D.B.*, 131 S. Ct. at 2401 (citations omitted).

Here, the parties dispute whether IMM was "in custody" when he was questioned at the police station, whether he was properly Mirandized, and, if so, whether he "voluntarily, knowingly and intelligently" waived his *Miranda* rights. We conclude that he was in custody and that he was not Mirandized, and therefore do not address the issue of waiver.

### A.  IMM was "In Custody" While Questioned by the Detective

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (internal quotation marks and citation omitted). "This inquiry requires a court to examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position." *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) (citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). "[W]e must determine whether the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *United States v. Kim*, 292 F.3d 969, 973–74 (9th Cir. 2002) (quotation marks and citation omitted); *see also Thompson v. Keohane*, 516 U.S. 99, 112 (1995) ("Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." (quotation marks and citation omitted)).

In *United States v. Kim*, we identified a non-exhaustive list of five factors that have often proven relevant in deciding whether a suspect was in custody: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." 292 F.3d at 974 (citations omitted).  As we

recognized in *Kim*, "[o]ther factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators." *Id.*

Although this inquiry is objective, the Supreme Court held in *J.D.B.* that "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to any reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test." 131 S. Ct. 2394, 2406. The Court cautioned that "a child's age [may] affect[] how a reasonable person in the suspect's position would perceive his or her freedom to leave," and warned that "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." *Id.* at 2402–03. Thus, *J.D.B.* recognized that for *Miranda*, as for so many other rights, common sense dictates that we must take into account the unique characteristics and vulnerabilities of children. *See id.* at 2404 ("'[O]ur history is replete with laws and judicial recognition' that children cannot be viewed simply as miniature adults." (quoting *Eddings v. Oklahoma*, 455 U.S. 104,115–16 (1982))); *Miller v. Alabama*, 132 S. Ct. 2455, 2470 (2012) ("[I]f . . . 'death is different,' children are different too. Indeed, it is the odd legal rule that does *not* have some form of exception for children."). To fail to recognize this tenet would be to invite legal error.

Here, the district court concluded that IMM was not in custody. We review the "in custody" determination de novo. *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) ("[A] district court's 'in custody' determination is a mixed question of law and fact warranting *de novo* review."

(quotation marks and citation omitted)).  "[T]he factual findings underlying the district court's decision . . . are reviewed for clear error," however.  *Id.* (citation omitted).

IMM does not challenge the district court's factual findings and, having carefully reviewed the record, we conclude that those findings are not clearly erroneous. However, applying the legal standard set forth above to the "determination" regarding IMM's custodial status, we conclude that IMM was "in custody" for *Miranda* purposes. A reasonable person, and especially a reasonable twelve year old child, in IMM's position would not, under all of the circumstances, have felt that he was free to terminate the interrogation and leave.

The first *Kim* factor, "the language used to summon the individual," slightly favors a finding that IMM was in custody.  In general, when a suspect voluntarily agrees to accompany police with an "*understanding that questioning would ensue*," this factor weighs against a finding of custody. *Kim*, 292 F.3d at 974 (emphasis in original) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1982) (per curiam)).  We have strongly cautioned, however, that "[v]oluntary initiation of contact with police cannot be, under any circumstances, the end of the inquiry into whether a defendant was 'in custody' during the encounter."  *Id.* at 975.  That warning applies with particular force here: although IMM's mother agreed to a voluntary meeting with the detective, there is no evidence that IMM himself ever agreed to an interview, understood it to be voluntary, or understood his mother's role in making the necessary arrangements.  Because the ultimate issue is whether IMM himself understood that he was free to leave, we cannot impute his mother's subjective awareness of the circumstances of the interview to IMM.  The evidence

shows only that, from IMM's vantage point, an armed detective arrived at his house one Saturday morning, drove him and his mother 30 to 40 minutes to a police station, and brought him to a small room where he remained for nearly an hour of questioning. Although the officer did not menace IMM or order him into the car, it is doubtful that a juvenile in IMM's position would have seen the circumstances of his arrival at the police station as the result of a free and voluntary choice to be questioned.

The second *Kim* factor, "the extent to which the defendant is confronted with evidence of guilt," overwhelmingly favors a finding of custody. "We have found a defendant in custody when the interrogator adopts an aggressive, coercive, and deceptive tone." *Bassignani*, 575 F.3d at 884.[10] Here, although the detective did not raise his voice, he repeatedly confronted IMM with fabricated evidence of guilt and engaged in elaborate deceptions. The detective fed IMM facts that fit the detective's predetermined account of what must have happened, accused IMM of dishonesty whenever IMM disagreed with the detective's false representations, and forced IMM to choose between adopting the detective's false account of events as his own and calling his own grandfather

---

[10] *See also United States v. Barnes*, 713 F.3d 1200, 1204–05 (9th Cir. 2013) (finding custody where, *inter alia*, "The FBI agents directly confronted Barnes with evidence of guilt before administering the *Miranda* warnings"); *United States v. Brobst*, 558 F.3d 982, 995–96 (9th Cir. 2009) (finding custody where, *inter alia*, "[the defendant] was immediately confronted with evidence of the child pornography against him"); *United States v. Wauneka*, 770 F.2d 1434, 1439 (9th Cir. 1985) (finding custody where, *inter alia*, "[t]he questioning progressed for over an hour and turned accusatory—Wauneka was told that he supplied information that only a perpetrator would know, that he matched the description of the rapist, and that he had better tell the truth.")

a liar. This last tactic directly played upon IMM's close relationship with his grandfather, whom he called "dad," and employed intense psychological coercion of a sort to which juveniles are uniquely vulnerable. *See J.D.B.*, 131 S. Ct. at 2403 (noting that children "are more vulnerable or susceptible to . . . outside pressure than adults" (quotation marks omitted)). Further, although the detective did not explicitly threaten IMM, he bluntly warned that the situation would "turn into a big thing if you're not going to be honest." Thus, while the detective told IMM at the outset of the interview that IMM could stop it if he felt uncomfortable, the detective's aggressive, coercive, and deceptive interrogation tactics created an atmosphere in which no reasonable twelve year old would have felt free to tell the detective, an adult making full use of his position of authority, to stop questioning him. *See id.* at 2405 ("Neither officers nor courts can reasonably evaluate the effect of objective circumstances that, by their nature, are specific to children without accounting for the age of the child subjected to those circumstances."). In fact, IMM's questioning ceased not when IMM asked that the detective stop but only when the detective had attained all the information he desired. Thus, from the beginning to the end of the interrogation, the detective made it clear that he believed that there was no doubt that IMM was guilty. It would only be normal for IMM to believe that, under all the circumstances, he would be required to remain at the police station or be transferred to some other detention site rather than be released whenever he decided to leave. Finally, given that the detective had driven him and his mother to the police station, more than a half hour from his home, IMM may well not have thought that he and his mother would be free to leave whenever they so desired.

The third *Kim* factor, "the physical surroundings of the interrogation," also weighs strongly in IMM's favor. While "[t]he fact that questioning takes place in a police station does not *necessarily* mean that such questioning constitutes custodial interrogation," *United States v. Coutchavlis*, 260 F.3d 1149, 1157 (9th Cir. 2001) (emphasis added), it often does. That is especially true for juveniles, who are more likely to be overwhelmed by entry into a police station staffed by armed, uniformed officers. *See Haley*, 332 U.S. at 599. Here, IMM was placed in a small room with the door closed. Although the door was unlocked, there is no evidence that IMM was aware of this fact. To the contrary, the detective twice exercised control over IMM's practical ability to enter and exit the room—first by ordering IMM to knock on the door if he needed to use the restroom and later by directing IMM to sit alone in the small room until the detective returned. *Compare Crawford*, 372 F.3d at 1059 (noting that a suspect is not in custody when, *inter alia*, "he does in fact leave without hindrance"). Similar to the suspect in *United States v. Barnes*, IMM's confrontation with the police occurred "in a small office, behind a closed door, inside the [police station]." *See* 713 F.3d at 1204–05 (concluding that the suspect was in custody). IMM's mother was present in the police station, but she was absent for the entire interrogation and there is no evidence that IMM believed he was free simply to stand up, leave, and find her. *Cf. Kim*, 292 F.3d at 977 (noting that "isolating the defendant from the outside world . . . largely neutralizes the familiarity of the location as a factor affirmatively undermining a finding of coercion").

In short, with respect to the third *Kim* factor, IMM was interrogated alone behind a closed door that appeared to be locked, in a small room in a police station located 30 to 40

minutes away from his home. He was told that, if he wanted to leave to use the restroom, he needed to knock and obtain the detective's permission. Faced with this situation and level of police control, a reasonable person would not likely have felt free to terminate the interrogation and leave the police station at will.

The next *Kim* factor, "duration of detention," strengthens the conclusion that IMM was in custody. IMM spent 30 to 40 minutes in the unmarked police car and then nearly an hour being questioned. Although our precedents do not specify a precise amount of time at which a detention turns custodial, we have found an adult defendant to have been in custody when she was interrogated for 45 to 90 minutes. *See Kim*, 292 F.3d at 972. Under all the circumstances, including the fact that IMM, as a juvenile, was likely more overwhelmed and intimidated than an adult would be by such prolonged direct questioning by an adult police officer, this *Kim* factor supports a finding of custody.

The fifth and final *Kim* factor, "the degree of pressure applied to detain the individual," confirms that IMM was in custody. As in *Kim*, "this was a full-fledged interrogation, not a brief inquiry," in which IMM was "detained for 'some time'" and then questioned for "at least [50 total] minutes." 292 F.3d at 977. This questioning was both hostile and accusatory, and, when conducted in isolation in a small room in a police station, quite capable of causing IMM considerable concern regarding his future. Although IMM was neither handcuffed nor arrested, "the scenario was not without pressure resulting from a combination of the

surroundings and circumstances encompassed by the other factors."[11] *Barnes*, 713 F.3d at 1204–05.

Ultimately, guided by the *Kim* factors, considering the totality of the circumstances of IMM's detention, and taking into account IMM's status as a juvenile, we conclude that a reasonable person in IMM's position would not have felt free to terminate the questioning and leave the police station. We therefore conclude that IMM was "in custody" during his interrogation by the detective.

## B.  IMM Was Not Mirandized

The government contends that IMM's custodial status does not affect the outcome of this appeal because IMM waived his *Miranda* rights.[12]  The question of waiver arises, however, only where a suspect has been Mirandized. *See Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010) (explaining that "*Miranda* imposes on the police a rule that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a *Miranda* warning").

---

[11] The district court gave weight to the fact that "the [detective] had no intention to arrest [IMM] on the date of the interview."  There is no evidence, however, that IMM was aware of the detective's subjective intent.  This consideration is thus irrelevant to the *Miranda* analysis.  *See Kim*, 292 F.3d at 973 ("The inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers . . .").

[12] As the district court did not address IMM's arguments that he was not Mirandized and that he did not waive his *Miranda* rights, we review them de novo.  Any facts found by the district judge that bear on these issues are reviewed for clear error.

Here, as the district court recognized, IMM "was not advised of his *Miranda* rights." The detective repeatedly conceded this crucial fact while testifying at the suppression hearing. When asked about his reading of the Parental Consent to Interview a Juvenile Form, the detective acknowledged that "[he] was reading to [IMM's mother]," that he did not tell IMM to listen to what he was reading, that he did not tell IMM that he had a right to remain silent, that he did not tell him he had a right to an attorney, and that he did not ask IMM if he wished to waive any of his rights or to sign any form on which he consented to doing so. When the detective read the Form to IMM's mother, who was "giggling and nervous," IMM was in the room, but the government offers no evidence to show that he participated in or was even listening to any discussion between the two adults.

As the Second Circuit recently emphasized in a case involving similar facts, it is not sufficient for the government to show only that an officer "read the warnings in a clear voice while standing near" or "within earshot" of a suspect. *United States v. Murphy*, 703 F.3d 182, 194 (2d Cir. 2012). The officer must read the *Miranda* warnings *to the suspect*, and thereby "clarify that a defendant may choose at any time to waive his rights *or* maintain those rights, including the right to remain silent." *Id.* at 193. Ultimately, *Miranda* requires that "*an individual* held for interrogation must be clearly informed [of *his* rights]." 384 U.S. at 471 (emphasis added). Here, IMM was never read his *Miranda* rights and the district court agreed with that description of what happened. Certainly it is clear that the detective did not explain the meaning or consequences of the *Miranda* rights

to IMM.  Accordingly, IMM's inculpatory statements during his interrogation by the detective must be suppressed.[13]

## III

IMM challenges the district court's determination that MM's younger brother, who was seven years old at the time of trial, was competent to testify as a witness.  We affirm the district court.

Federal Rule of Evidence 601 states that "[e]very person is competent to be a witness unless these rules provide otherwise."  Congress has made clear that this presumption extends to children by providing in 18 U.S.C. § 3509(c)(2) that "a child is presumed to be competent."  Congress has also provided that when a court examines the competence of a minor to testify, it may assess only "the child's ability to understand and answer simple questions." *Id.* at § 3509(c)(8).

Here, the district court concluded that the seven year old child was competent after a careful examination in open court, with questioning by the prosecutor, defense counsel, and the court.[14]  The hearing tested the child's ability to understand and answer simple questions, his understanding of

---

[13] The government does not argue that IMM's inculpatory statements, if inadmissible, were harmless.

[14] The district court reached a preliminary determination right after the competency hearing.  It then finalized this determination after the government's case-in-chief.  At that point, the district court reasoned that, while the child "didn't understand oath," he "did seem to understand truth versus lie."  The district court also suggested that concerns about the child's testimony went to "the weight rather than the admissibility" of his statements as evidence.

the difference between truth and falsity, and his comprehension of the importance of telling the truth. *See Pocatello v. United States*, 394 F.2d 115, 117 (9th Cir. 1968) (noting that appreciation of "the difference between truth and falsehood" and "the capacity for observation, recollection and communication" are vital to competency determinations for juveniles). The district judge, after observing the child and reviewing his answers, determined that he was competent to testify. That determination merits deference. As we have recognized, "[t]he competency of a child as a witness is a matter within the discretion of the trial judge and his decision will not be disturbed unless clearly erroneous." *Id.* at 116–17.

IMM argues that the child's testimony must nonetheless be excluded because he could not understand exactly what an oath requires. This proposed requirement for testimony by children is too rigid. While Federal Rule of Evidence 603 states that "a witness must give an oath or affirmation to testify truthfully," the accompanying Advisory Committee Note emphasizes that "[t]he rule is designed to afford the flexibility required in dealing with religious adults, atheists, conscientious objectors, mental defectives, and *children*." (emphasis added). It adds that "[a]ffirmation is simply a solemn undertaking to tell the truth; no special verbal formula is required."

Here, the district court concluded that the child understood the difference between truth and falsity, and that he understood the special importance of speaking truthfully while testifying. That conclusion was not clearly erroneous. Although the child's testimony suggested many reasons to seriously doubt his understanding or recollection of the events in question, notably including his statements that he did not

recall what had happened and that he had been told what to say at trial by his mother, the district judge correctly concluded that those considerations affected the weight his testimony merited rather than his competence under Rules 601 and 603 to offer that testimony at all.[15] Accordingly, we affirm the district court's determination that MM's younger brother was competent to testify at trial.[16]

## IV

Finally, IMM contends that the evidence at trial was insufficient to support his conviction. The answer to this question remains important. A reversal on the ground of a *Miranda* violation does not bar retrial under the Double Jeopardy Clause, while a reversal for insufficiency of the

---

[15] IMM does not argue that the child's testimony should have been excluded on any other grounds. We therefore do not consider other possible grounds on which his testimony—which, by his own admission, was not based on his personal recollection of the disputed events and instead reflected what his mother had told him to say—might have been excluded, such as failure to satisfy the balancing test required by Rule 403 and failure to satisfy the personal knowledge requirement set forth by Rule 602.

[16] IMM suggests that the child's alleged inability to understand his oath may have violated IMM's Confrontation Clause rights. Even if the child's statements concerning the importance of telling the truth did not reassure us, we would still reject this argument. As we explained in *Walters v. McCormick*, "Incapacity to understand the duty to testify truthfully does not automatically offend the Confrontation Clause when the witness in question is a young child. At least where, as here, there is reason to believe that the incriminating testimony will be truthful, a young child may constitutionally be a witness." 122 F.3d 1172, 1175–76 (9th Cir. 1997); *see also id.* at 1176 ("No federal court has held that the Constitution places limits on allowing even the youngest child to testify at trial.").

evidence does preclude a second trial under that provision. *See, e.g.*, *United States v. Boulware*, 384 F.3d 794, 809–10 (9th Cir. 2004).

We review a sufficiency-of-the-evidence claim de novo. *United States v. Odom*, 329 F.3d 1032, 1034 (9th Cir. 2003). There is insufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc).

IMM was convicted of being a juvenile delinquent on grounds of sexual abuse of a minor, in violation of 18 U.S.C. §§ 2241(c) and 2246(2)(A). More specifically, he was convicted of knowingly engaging in a sexual act with another person who had not attained the age of twelve.[17] The

---

[17] 18 U.S.C. § 2241(c) provides as follows:

> (c) With children.—Whoever crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, or *in the special maritime and territorial jurisdiction of the United States* or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency, knowingly engages in a sexual act with another person who has not attained the age of 12 years, or knowingly engages in a sexual act under the circumstances described in subsections (a) and (b) with another person who has attained the age of 12 years but has not attained the age of 16 years (and is at least 4

government therefore had to prove beyond a reasonable doubt that IMM committed a "sexual act" as defined by § 2246(2). It invoked the definition of "sexual act" set forth at § 2246(2)(A): "[C]ontact between the penis and the vulva or the penis and the anus, . . . contact involving the penis occurs upon *penetration*, however slight." (emphasis added).

IMM argues that the government failed to prove beyond a reasonable doubt that IMM penetrated MM's anus; at best, he asserts, it proved that IMM's penis made contact with MM "between the cheeks." Although it is a close question, we conclude that the evidence at trial, viewed in the light most favorable to the government, was sufficient to support the conviction.[18]

The government did not present any physical evidence of penetration. Instead, it relied mainly on testimony by IMM's grandfather, MM's younger brother, and MM's mother, two excited utterances by MM,[19] and IMM's videotaped statement to the detective. Neither IMM's grandfather nor MM's

---

          years younger than the person so engaging), or attempts
          to do so, shall be [punished] . . .

(emphasis added).

[18] Our analysis considers all the evidence introduced at trial, including the inculpatory statements by IMM that should have been suppressed, because if there had been insufficient evidence even with those statements then double jeopardy would bar retrial. (Without that statement, however, it is clear, as our analysis in the text demonstrates, that the evidence would not have been sufficient and acquittal would have been required.)

[19] MM told her grandfather that the boys told her to take her clothes off. She told her mother that IMM "made her do it." IMM does not contest the admissibility of these statements as excited utterances.

mother saw the disputed events, or heard or observed anything before or after them bearing on the specific subject of penetration. Nor does their testimony permit an inference of penetration. The same is true of MM's two excited utterances, neither of which in any respect implies any penetration.[20] This leaves only the eyewitness testimony of MM's brother, a seven year old child, and IMM's inculpatory statements to the detective.

The seven year old child's testimony that he saw IMM put his "dingamajiger" in MM's "private," the part that "poops," taken in context, supports the element of penetration only slightly and would not, standing alone, be enough to provide sufficient evidence. Although the child testified that he saw IMM and MM "having sex," he admitted that he did not know what this meant or where he had learned the expression, "having sex." He also conceded that he did not remember the incident and stated that his mother, who was not an eyewitness, had told him what to say at trial. In any event, his testimony does not offer a basis for distinguishing between "in the cheeks" and penetration. As the district judge recognized, the testimony could support an inference of penetration only to the extent it is corroborated by other evidence.[21]

---

[20] Both of these statements might well have referred only to her removing her clothes or sitting on IMM's lap with his pants down, or anything else.

[21] The district judge thus explained that "I – the Court views [the child's] testimony with great caution given his very young age and given the – especially in the age of a young child, the incredible length of time that has passed since the incident. And certainly, if the Court had only had [the child's] testimony to rely on in this case, I – I would have great concerns in relying solely on that testimony. So in this Court's mind as

Ultimately, then, the conviction stands or falls on IMM's inculpatory statements to the detective.[22] Those statements, following the detective's use of a variety of deception-based interrogation techniques, included the following: that IMM put his "weenie in [MM's] butt" while she faced away from him, that she had her pants off at the time, that his zipper was down, and that he held her sides while she was sitting on him. Reading this evidence in the light most favorable to the government we cannot hold that it is insufficient to support the conviction.

**V**

We conclude that the district court had jurisdiction over IMM, that the district court did not err in allowing the seven year old child to testify, and that the evidence at trial, including IMM's inculpatory statements, was not insufficient to support the conviction. We reverse and remand, however, because IMM's inculpatory statements were obtained in violation of his *Miranda* rights and should have been suppressed.

**REVERSED AND REMANDED.**

---

the trier of fact, that testimony would need to be corroborated before the Court would consider it."

[22] The district court so stated while explaining its judgment that "the Court does rely heavily on the interview of the defendant."