[Cite as *State v. Olan*, 2024-Ohio-1257.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230228<br>TRIAL NO. 22CRB-16534 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | : | *O P I N I O N.* |
| GUSTAVO OLAN, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Municipal Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 3, 2024

*Emily Smart Woerner*, City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Joseph M. Cossins*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *David Hoffmann,* Assistant Public Defender, for Defendant-Appellant.

**ZAYAS, Judge.**

**{¶1}** Gustavo Olan appeals his conviction, after a no-contest plea, for engaging in prostitution. In one assignment of error, Olan argues that the trial court erred by overruling his motion to suppress his statements because he was subjected to a custodial interrogation and was not advised of his *Miranda* rights, in violation of the Fifth Amendment. For the following reasons, we affirm the judgment of the trial court.

### Factual Background

**{¶2}** Olan was charged with engaging in prostitution for paying a woman $23 for oral sex. Olan pled not guilty and filed a motion to suppress all statements he made to the officer contending that he was in custody when he made the statements and should have been given proper *Miranda* warnings before he was questioned.

**{¶3}** At the hearing on the motion, Officer Shideler, with the Cincinnati Police Department ("CPD"), testified that he was patrolling near Mansion and Kinsington Avenues when he saw a car turn left on Kinsington, drive to the left of an oncoming vehicle, and park on the wrong side of the street. Shideler parked his cruiser behind Olan's vehicle. Officer Buck drove next to the vehicle and spoke to the female passenger. When Buck determined that the passenger had outstanding warrants, he arrested her.

**{¶4}** After the female passenger was arrested, Shideler approached the passenger window and spoke with the driver of the vehicle, Gustavo Olan. When Shideler asked him for identification, he realized there was a language barrier. Olan handed his passport to Shideler. When Shideler asked Olan for the vehicle paperwork, Olan stepped out of the vehicle, leaving the keys in the ignition. Olan raised his hands briefly, and a third officer, standing on the driver's side of the vehicle, asked him to

return to the vehicle. Olan remained in his car with the window rolled up while Shideler checked his identification.

{¶5} Shideler carried the passport to his cruiser to run Olan's name through his computer database to check for warrants and any other available information. While Shideler was checking Olan's identification, Buck approached his window and told him that the female passenger did not know Olan. Shideler looked at the female's criminal history and learned that she had an extensive history of prostitution. Both officers suspected that Olan and the passenger had engaged in prostitution. Both believed that the female passenger was unlikely to admit to anything, and that "the John's" are more likely to admit to it.

{¶6} Shideler walked back to Olan's car and used a Google translate app to ask for the vehicle's paperwork. Olan stepped out of his car, on his own accord, and walked to the rear of the vehicle, pointed at the license plate, indicating that he had no paperwork. Olan's vehicle had a Kentucky temporary tag, so Shideler could not access the vehicle registration. Shideler used the app to ask Olan if the woman was a prostitute, and Olan smirked and responded, "Maybe." Shideler asked Olan how much he paid her for oral sex, and Olan said $25 then changed the amount to $23. When asked where the oral sex occurred, Olan said in the parking lot of his house. Shideler arrested him for prostitution.

{¶7} Shideler further testified that Olan freely spoke with him. Shideler did not place him in handcuffs or in his cruiser, pat him down, or draw his weapon. They were parked on a residential street.

{¶8} During cross-examination, Shideler confirmed that two other officers were present, and each arrived in separate cruisers. Excerpts of Buck's and Shideler's

body-camera videos were played in court. As reflected in the trial transcript, only excerpts of Shideler's and Buck's body-camera videos were relied upon by the trial court in rendering its decision. Although the disc admitted into evidence contained the full body-camera recordings of Shideler and Buck and a third video that was not played during the motion-to-suppress hearing, defense counsel identified for the record the excerpts played in court by referencing the time stamps of the portions that were played.

{¶9} Olan played the portion of Buck's video that showed the passenger's arrest and Buck explaining the car was parked on the wrong side of the road. The excerpts from Shideler's video depicted the initial interaction with Olan. When Shideler asked for identification, Olan responded, "passport," and reached into the center console to retrieve the passport. The trial court viewed Shideler's conversation with Buck and Shideler's questioning of Olan. Shideler spoke into the translator app, "Do you have paperwork for the car?" Olan read the message and responded, "It's new one, the dealer, no, no." Olan walked to the rear of the truck and pointed to the temporary tag. For the next four-and-a-half minutes, the two communicated back and forth using the translator app. Olan voluntarily responded to Shideler's questions and admitted to paying the woman for oral sex.

{¶10} Shideler testified that Olan was not free to leave during the traffic investigation. Shideler decided to arrest Olan when he admitted to prostitution.

{¶11} After Shideler's testimony, defense counsel argued that he was not free to leave because Olan "gave Shideler a passport from another country," was not from this country, did not speak the language, three officers surrounded him, and Olan submitted to the officers' authority by raising his hands. Olan's argument focused on

the fact that Olan was not free to leave and that "he was seized," and "seizure is custody."

{¶12} At the conclusion of the arguments, the trial court rendered its decision and determined that "the questioning at issue in this case was not the product of custodial interrogation," and overruled the motion. The court made the following findings:

> The interview was brief in nature. I would submit not substantially longer certainly than any ordinary traffic stop, a great deal of the discussion, at least offered in video, concerns the license plates of the vehicle, the registration of the vehicle, certainly the matter was delayed by the obvious language barrier between the officers and defendant, but it was I think, a relatively brief interaction between the defendant and the police.

> And while the officer testified that the defendant was not actually free to leave, the question is, would a reasonable person in the suspect's position would have understood that situation?

> Again, very subjective question and analysis, but it is, I think, noteworthy, that at least twice that was viewed on video, the defendant elected to exit the vehicle. The first time, he was instructed by, I believe it was Officer Buck, to get back in the vehicle. The second time, he exited the vehicle and walked of his own volition towards the rear of the vehicle, pointing as he was to the license plate or temporary tag on the video. He did not appear to believe that his freedom was restricted. He was not handcuffed. He was not told he was under arrest. He was

certainly never threatened in any way. On the contrary, the officers, specifically Officer Shideler, appeared to go to some length to obtain a translation app that would allow him to communicate clearly with the defendant, and the defendant appeared to participate in that discussion willingly and of his own volition.

I do not think a fair characterization to suggest that the police verbally dominated this interaction at all, which consisted of primarily typing, as I understood it, typing statements into an app on a cellphone, showing it to the defendant, who then typed his responses, showing them to the police. The questions were short, they were straightforward. Again, I don't think there was any question that police took – that the police did not take any action that could be fairly characterized as overpowering, tricking, or coercing the defendant into making a statement.

**{¶13}** Olan now appeals, and in one assignment of error, he argues that the trial court erred by denying the motion to suppress.

### Standard of Review

**{¶14}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence, then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *State v. Childers*, 1st Dist. Hamilton No. C-220301, 2023-Ohio-948, ¶ 7, citing *Burnside* at ¶ 8.

6

## Law and Analysis

{**¶15**} To protect the Fifth Amendment privilege against compulsory self-incrimination, police must inform individuals of their right to remain silent and their right to counsel before undertaking a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467-468, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 9, quoting *Miranda* at 444.

{**¶16**} The fundamental question is whether "under the totality of the circumstances, a reasonable person in the suspect's position would have understood himself or herself to be in custody." *Id.* Custody, for the purpose of *Miranda*, is where there was a formal arrest or a restraint on the individual's freedom of movement to the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). "[T]he test is not whether the individual feels free to leave but whether the situation 'exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.' " *Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

{**¶17**} Determining whether an individual's freedom of movement was curtailed, is simply the first step in the analysis, not the last. *Howes v. Fields*, 565 U.S. 499, 509, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012). The freedom-of-movement inquiry is, "only a necessary and not a sufficient condition for *Miranda* custody." *Id.*, citing

*Maryland v. Shatzer*, 559 U.S. 98, 112, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010). Accordingly, "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Id.* Instead, the focus should be "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* The "temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *Id.* at 113.

{¶18} As the *Oles* court explained:

If the inquiry were whether the driver felt free to leave, then every traffic stop could be considered a custodial interrogation because 'few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so.' *Berkemer*, 468 U.S. at 436, 104 S.Ct. 3138, 82 L.Ed.2d 317. And a law-enforcement officer, in the midst of investigating a traffic stop and performing all its attendant procedures, would not consider a driver free to leave unless given permission. But 'not free to leave' and 'in custody' are distinct concepts.

*Oles* at ¶ 30.

"The mere exercise of police investigative duties does not equate with custody." *State v. Coleman*, 7th Dist. Mahoning No. 06 MA 41, 2007-Ohio-1573, ¶ 16. During an investigatory detention, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions" without the need to first advise the detainee of his *Miranda* rights. *Berkemer* at 439-440.

{¶19} The sole issue is whether Olan was in custody, requiring *Miranda* warnings before the police questioning that led to his various admissions. Here, there is no dispute that Olan was not free to leave and had not been formally arrested. The initial encounter was a routine traffic stop because Olan was detained for a traffic violation. At the time of the questioning, the traffic stop had not been completed because Olan had not produced his vehicle registration. *See Coleman* at ¶ 35 (explaining that the officer was still investigating and processing the traffic violation due to defendant's failure to provide his license, vehicle registration documents, and proof of insurance). Therefore, to determine if Olan was in custody, the question is whether the totality of circumstances demonstrates a restraint on Olan's freedom of movement to the degree associated with a formal arrest. *See Beheler* 463 U.S. at 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275.

{¶20} Factors relevant to whether a custodial interrogation occurred include: 1) the location where the questioning took place; 2) whether the defendant was a suspect at the time the interview began (bearing in mind that *Miranda* warnings are not required simply because the investigation has focused); 3) whether the defendant's freedom to leave was restricted in any way; 4) whether the defendant was handcuffed or told he was under arrest; 5) whether threats were made during the interrogation; 6) whether the defendant was physically intimidated during the interrogation; 7) whether the police verbally dominated the interrogation; 8) the defendant's purpose for being at the place where the questioning took place; 9) whether neutral parties were present at any point during the questioning; and 10) whether the police

took any action to overpower, trick, or coerce the defendant into making

a statement.

*State v. Montgomery,* 1st Dist. Hamilton No. C-220063, 2022-Ohio-4030, ¶ 21, citing *State v. Estepp*, 2d Dist. Montgomery No. 16279, 1997 Ohio App. LEXIS 5279, 10-11 (Nov. 26, 1997).

**{¶21}** In this case, the location of the stop was a public, residential street, which is not as police dominated as an interrogation room at a police station. *See Berkemer* 468 U.S. at 421, 104 S.Ct. 3138, 82 L.Ed.2d 317. Three officers responded to question two suspects. Olan was questioned primarily by Shideler with another officer asking him once to return to his vehicle. The presence of three officers was not excessive. *See United States v. Crooker*, 688 F.3d 1, 12 (1st Cir.2012) (determining a suspect was not in custody when "no more than two agents were in direct conversation" with the suspect at one time). Significantly, Olan does not allege that the officers were threatening, coercive, displaying weapons, or physically restraining him. Olan was not patted down, handcuffed, or placed in a police cruiser. Olan voluntarily exited from his car, unimpeded by the officers, and walked to the back of the car to show the officers the temporary tag. Olan answered Shideler's questions and engaged in conversation with him. As the trial court found, and the video confirmed, the language barrier did not prevent them from communicating as communication was facilitated with the use of a translation app. The stop was brief and the questioning occurred during an investigative detention.

**{¶22}** Although Olan mentioned that he had given his passport to Shideler in his motion and at the suppression hearing, he never argued that Shideler retained his passport or that the retention of the passport suggested he was in custody. Even if he

had, the argument is unpersuasive. At the time, the officers were attempting to confirm the vehicle's registration and temporary tag, and the only identification presented to Shideler was the passport. Thus, any retention of the passport was in furtherance of the investigation of the traffic violation. *See State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 12 (When one has been detained so that the police may investigate a traffic violation, the police may detain the individual for the length of time necessary to check the driver's license, vehicle's registration, and the vehicle's license plate.).

**{¶23}** Moreover, this argument relies on a portion of the video that the trial court did not view during the motion-to-suppress hearing or consider in making its determination. While a disc was submitted into evidence containing multiple videos, the record is clear that the trial court only considered the portions played during the motion to suppress hearing. The judge immediately ruled on the motion at the conclusion of the hearing without stepping off the bench or reviewing the portions of the video not played in court. "As a reviewing court, our record is limited to the record before the trial court." *State v. Crump*, 1st Dist. Hamilton Nos. C-190636 and C-190637, 2021-Ohio-2574, ¶ 19, citing *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978). In *Crump*, "appellate counsel advanced an argument attacking the conviction based on footage that the trial court did not view but that allegedly was submitted to the court on the DVD containing the videos from the body-worn cameras." *Id.* This court concluded that it could only consider "the footage that defense counsel specifically identified and showed in court," and ultimately determined that "[b]ecause this new argument is based on evidence outside the record, we reject it." *Id.*, citing *Ishmail* at paragraph one of the syllabus. Accordingly, we too

should not consider evidence that was outside of the court's consideration and review, regardless of whether it was admitted into the appellate record. *See Fifth Third Mtge. Co. v. Salahuddin*, 10th Dist. Franklin No. 13AP-945, 2014-Ohio-3304, ¶ 13 ("Appellate review is limited to the record as it existed at the time the trial court rendered judgment."); *Ishmail* at 405 ("in an appeal on questions of law the reviewing court may consider only that which was considered by the trial court and nothing more").

{¶24} Olan further argues on appeal that he was subjected to a custodial interrogation because Olan was not fluent in English and Shideler disregarded Olan's attempts to communicate via the translator app rendering Olan "helpless to communicate with the officer." We note that Olan did not argue at the suppression hearing that Shideler disregarded his communications. Moreover, the trial court found that the officer did "obtain a translation [app] that would allow him to communicate clearly with [Olan]".

{¶25} The dissent concludes that Olan's language barrier is a factor that weighs in favor of a custodial interrogation. It is true that a few courts have found that under certain circumstances, English language capabilities might have an "objectively discernible relationship to a reasonable person's understanding of his freedom of action" that could bear on the custody analysis for purposes of *Miranda. United States v. Han*, 199 F.Supp.3d 38, 52-54 (D.D.C.2016), citing *J.D.B. v. North Carolina*, 564 U.S. 261, 275, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). However, in those cases, the language barrier created confusion and a lack of understanding that was apparent to the officers. *See, e.g., United States v. Kim*, 292 F.3d 969, 977 (9th Cir. 2002) (defendant's limited English proficiency, which the officer's knew, bore on the

defendant's ability to understand whether she was a criminal suspect where the police took complete control of her store, questioned her for at least 30 minutes without an interpreter and another 20 minutes once the interpreter joined the interrogation, ordered her to speak English, and isolated her from her husband and son); *Han*, at 48 (defendant, a non-English-speaking alien seafarer, was under the functional equivalent of custody when the government confined him to a ship for a month, denied his request to leave, took his passport, refused to allow him to return to his home country, and had a government agent constantly supervising him). Here, as previously noted, any language barrier was overcome by the use of a translation app that allowed Olan and the officer to effectively communicate.

{¶26} Finally, during oral argument, appellate counsel suggested, for the first time, that the video showed that Olan's vehicle **may** have been blocked in by a car parked in front of him, a police cruiser on his passenger side, and a police cruiser parked behind him. (Emphasis added.) However, the portion of the video that appellate counsel cited to in support of this argument was not played at the hearing on the motion to suppress. Nonetheless and significantly, appellate counsel conceded it was "hard to tell" whether the car was blocked in and admitted "it isn't a situation like *Bailey* where he is totally boxed in."

{¶27} "It is well-settled law that issues not raised in the trial court may not be raised for the first time on appeal because such issues are deemed waived." *City of Columbus v. Ridley*, 2015-Ohio-4968, 50 N.E.3d 934, ¶ 28 (10th Dist.), quoting *State v. Barrett*, 10th Dist. Franklin No. 11AP-375, 2011-Ohio-4986, ¶ 13. This applies to arguments not asserted either in a written motion to suppress or at the suppression hearing. *Id.*, citing *State v. Johnson*, 10th Dist. Franklin No. 13AP-637, 2014-Ohio-

671, ¶ 14; *State v. Vaughn*, 12th Dist. Fayette No. CA2014-05-012, 2015-Ohio-828, ¶ 9; *State v. Perkins*, 9th Dist. Summit No. 21322, 2003-Ohio-3156, ¶ 13; *State v. Molk*, 11th Dist. Lake No. 2001-L-146, 2002-Ohio-6926, ¶ 11. The failure to make an argument before the trial court in support of a motion to suppress "constitutes waiver of the defenses or objections." *Molk* at ¶ 9, citing Crim.R. 12(H). "Consequentially, this appellate court is unable to conduct its ordinary standard of review as there are no factual findings upon which to defer and no application of law to apply." *Id.*

{¶28} Even if, and despite appellant's concession to the contrary, Olan's vehicle was blocked in, as the dissent finds, it is insufficient to establish that the restraint on Olan's freedom was akin to an arrest and required *Miranda* warnings. "As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *State v. Jacks*, 5th Dist. Muskingum No. CT2022-0013, 2022-Ohio-4374, ¶ 21, citing *Howes v. Fields*, 565 U.S. 499, 132 S.Ct. 11181, 182 L.Ed.2d 17 (2012). As Shideler testified, Olan was not free to leave during the traffic stop, so his freedom of movement was curtailed. But, as the *Howe* court explained,

> Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. We have 'decline[d] to accord talismanic power' to the freedom-of-movement inquiry, *Berkemer* at 437, 104 S.Ct. 3138, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. 'Our cases make

14

clear ... that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody.' *Shatzer*, 559 U.S. 98, 112, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010).

*Howe* at 509. Because Olan was not free to leave during the traffic stop, whether his car was also blocked only reinforces that his freedom of movement was curtailed. However, it sheds no light on whether Olan faced "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *See Shatzer* at 112. As previously discussed, Olan voluntarily participated in the brief questioning and was not subject to the inherently compelling pressures of a custodial situation and does not allege that the officers were threatening, coercive, displaying weapons, or physically restraining him.

{¶29} Accordingly, we find that given the circumstances, a reasonable person would not have considered himself or herself in custody under Miranda and we overrule the sole assignment of error.

## Conclusion

{¶30} Having overruled the sole assignment of error, we affirm the judgment of the trial court.

Judgment affirmed.

**BERGERON, J.**, concurs separately.
**CROUSE, P.J.,** dissents.

**BERGERON, J.,** concurring separately.

{¶31} I concur in the lead opinion's judgment affirming the trial court's denial of Mr. Olan's motion to suppress because I agree that he was not in custody for the purposes of *Miranda* when police questioned him about solicitation. But I write

separately because I disagree with how the lead opinion engages with the record in the course of its analysis. Considering the full record and the arguments preserved below, I conclude that custody was a much closer call than acknowledged by the lead opinion.

**{¶32}** To avoid the undesirable drawbacks of a bright-line rule to enforce *Miranda*'s safeguards in the context of traffic stops, the United States Supreme Court left lower courts flexibility in determining whether, under the totality of the circumstances, a suspect is "in custody" for the purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 441, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *see City of Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 22. Though Ohio courts have not uniformly adopted a single set of factors to assess custody for purposes of *Miranda*, this court has previously utilized the flexible ten-factor inquiry that the trial court below relied upon. *See State v. Montgomery*, 1st Dist. Hamilton No. C-220063, 2022-Ohio-4030, ¶ 21.

**{¶33}** Mr. Olan raises several custody arguments on appeal that the lead opinion rejects because, in its view, he failed to raise them below, leaving us with no factual findings from the trial court to review on those points. I agree that we lack factual findings from the trial court on each of these arguments, but, at least for the passport issue, the absence of findings is not for Mr. Olan's lack of trying. Because the trial court failed to directly engage on that point, this court should independently review the record to determine whether those arguments, in addition to those discussed by the trial court in its oral decision, add up to a legal conclusion that Mr. Olan was in custody at the time of police questioning.

**{¶34}** The lead opinion correctly notes that Mr. Olan failed to raise two arguments in support of his overall custody argument below. He never argued that

the officer disregarded his attempts to communicate back with his own phone, which might suggest a police-dominated environment. And he never argued that his vehicle was blocked in by the police cruisers parked beside and behind it and by the civilian vehicle directly in front of it (although it certainly appears to be from the body-worn camera footage). I, too, set these arguments aside as I consider the trial court's custody determination de novo. However, he unquestionably raised the passport issue at the suppression hearing, saying he "gave Officer Shideler a passport from another country. He's not from this country." Unlike the lead opinion, then, Mr. Olan's related arguments factor into my custody assessment.

{¶35} Further, I disagree with the lead opinion's approach to the body-camera video. Defense counsel indisputably entered Officer Shideler's full body-camera video into evidence. Throughout the hearing, counsel used clips of the video to highlight Mr. Olan's key arguments, perhaps figuring that the court might find a more active and focused inquiry more persuasive rather than simply clicking "play" on the video and letting it run. Although defense counsel sometimes mentioned specific timestamps when starting or pausing the video, the transcript also reflects counsel at times starting and stopping the video without specifying a starting or ending point. Of course, as an appellate court, we are generally confined to the factual record established in the trial court. And that's partly my point here—the full body-camera *is* part of the trial record. Defense counsel specifically moved it into evidence at the conclusion of the suppression hearing, and it was admitted without any objections from the state. To blind ourselves to the full video simply because defense counsel often, but not always, specified timestamps that were played at the hearing trivializes the trial court's role in managing the trial record. By the lead opinion's logic, any page of a document or piece

17

of evidence that we cannot prove *for certain* that the trial court read or viewed should be disregarded on appeal despite its literal, physical presence in "the record." That would empower the appellate court to remake the trial record at its own will and would suggest a hyper-technical parsing of the record at odds with extant precedent. Further, unlike in *State v. Crump*, which the lead opinion relies on here, the full-camera video was not "allegedly" submitted to the court; the trial court here explicitly admitted it into evidence. *See State v. Crump*, 1st Dist. Hamilton Nos. C-190636 and C-190637, 2021-Ohio-2574, ¶ 19. Therefore, any arguments raised below that rely, even just in part, on the body-camera video are not "based on evidence outside the record," and we should consider the extent to which the video supports them on appeal. *Id.* Lest we not forget, "[t]he original papers and exhibits thereto *filed in the trial court * * * shall constitute the record on appeal* in all cases." (Emphasis added.) App.R. 9(A)(1).

{¶36} Nonetheless, factoring in the full video insofar as it relates to any arguments raised at the trial level, I ultimately agree with the conclusion that, under the totality of the circumstances, a reasonable person in Mr. Olan's position would not believe himself to be in custody. As the trial court found, police asked Mr. Olan "short" and "straightforward" questions and never threatened him "in any way." The entire interaction leading up to his arrest lasted approximately 14 minutes, which, as it found, is "not substantially longer certainly than any ordinary traffic stop." Additionally, it found Mr. Olan participated in the discussion with police, albeit primarily through a translation app, "willingly and of his own volution." I note that we only have the officer's side of the story (through his testimony) about what was communicated through the app; we don't have Mr. Olan's account about whether he was confused or misunderstood the interaction, for example. But from the body-

camera video, it does appear that Mr. Olan participated willingly in the translated discussion and generally seemed to understand the situation. Indeed, he freely moved about the area around the vehicle even after an officer initially told him to stay seated inside. And he willingly answered questions, sometimes in one- or two-word English replies, without any pressure from police to answer quickly or in a specific way. Because the record and body-camera video support the trial court's findings on these issues, its findings command our deference. *See Montgomery*, 1st Dist. Hamilton No. C-220063, 2022-Ohio-4030, at ¶ 15.

{¶37} Weighing those additional facts not fully considered by the lead opinion, Mr. Olan's argument for custody gets closer to tipping the scales, but it still does not add up to custody. Although he raised at the hearing below the fact that police retained his passport during the traffic stop, and I believe that fact is very probative of the custody inquiry, standing alone it does not do enough to trigger a custody conclusion. Combined with the trial court's credible conclusion that the stop lasted no longer than an ordinary traffic stop, the fact officers held onto his identification throughout the interaction does not weigh heavily toward custody.

{¶38} Further, I write to emphasize the importance of considering Mr. Olan's language barrier, which I also believe can be probative of the custody determination. Below, Mr. Olan argued that "police took advantage of the language barrier," and that he "doesn't speak the language, he's not in his home country, he's surrounded by officers. There's no way he believed he was free to leave." But Mr. Olan failed to advance an argument that, given the nature of the police's translation attempts, the barrier would have affected a reasonable person in his position's " 'understanding of his freedom of action,' " and that officers would have discerned the barrier's custody

implications. *See United States v. Burden*, 934 F.3d 675, 695 (D.C.Cir.2019) (holding a language barrier relevant to the custody inquiry based on "whether a reasonable officer would have been able to discern that the language limitations of a reasonable person in the suspect's position would have contributed to that person's not feeling free to leave"), quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 275, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). I see no evidence that officers took advantage of Mr. Olan's limited English abilities, nor that he failed to comprehend what was going on.

{¶39} Ultimately, I concur in the judgment affirming the trial court's decision denying Mr. Olan's motion to suppress because I agree with the lead opinion that he was not in custody for purposes of *Miranda*.

**CROUSE, P.J.,** dissenting.

{¶40} Olan was subjected to a custodial interrogation and was not advised of his *Miranda* rights. Because I would hold that the trial court erred by overruling Olan's motion to suppress his statements, I must respectfully dissent.

{¶41} *Miranda* announced principles to "deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or *otherwise deprived of his freedom of action in any significant way.*" (Emphasis added.) *Miranda v. Arizona*, 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The purpose of *Miranda* warnings is to "protect a suspect from the coercive pressure present during a custodial interrogation." *City of Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 9.

{¶42} In *Berkemer v. McCarty*, the Supreme Court held that traffic stops typically are more analogous to *Terry* stops, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868,

20 L.Ed.2dd 889 (1968), than formal arrests. *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). This is because traffic stops are usually temporary and brief, made in public, conducted by "only one or at most two policemen," and are not under circumstances "such that the motorist feels completely at the mercy of the police." *Id.* at 438. However, the court recognized that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440.

**{¶43}** "The relevant inquiry is whether, under the totality of the circumstances, a reasonable person in the suspect's position would have understood himself or herself to be in custody." *Oles* at ¶ 1.

**{¶44}** This case may have started out as a routine traffic stop, but it evolved into a custodial interrogation. As the lead and concurring opinions correctly point out and the trial court found, there are several aspects of Olan's interaction with the officers that could indicate that he was not in custody. However, an examination of the totality of the circumstances leads me to conclude that the situation exerted upon Olan pressures that sufficiently impaired his free exercise of his privilege against self-incrimination and required that he be warned of his constitutional rights. *See id.* at ¶ 31.

**{¶45}** First, Olan was blocked in by three police cars with their lights on and three police officers were on the scene. This is quite different from the one or two officers envisioned in the *Berkemer* case. *See Berkemer*, 468 U.S. at 438, 104 S.Ct. 3138, 82 L.Ed.2d 317 ("The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability."). The

body-camera video played at the suppression hearing and the testimony at the hearing revealed that there were three police cars on the scene. At least one police car was parked behind Olan and one was parked in the road next to him, basically blocking him in. The video also revealed that there were cars parked on the side of the street in front of Olan's vehicle. While Olan could have possibly managed to jump into his car and steer it between the police cars and parked cars and onto the street in order to leave the scene, no reasonable person in Olan's position would have believed he could do that. *See, e.g., State v. Goodloe*, 10th Dist. Franklin No. 13AP-141, 2013-Ohio-4934, ¶ 13 (holding that a reasonable person would not feel at liberty to ignore the police and walk away when one police cruiser pulled up right next to the defendant, who was standing on the sidewalk, and then one of the officers exited from the vehicle and stood "directly in front of [the defendant]," and another officer "came up on his side and stood within one or two feet of him").

**{¶46}** Second, the officer testified at the suppression hearing that Olan was not free to leave. While the subjective views of the officer do not settle the custody question, the officer's impressions do shed some light on the objective circumstances of the situation.

**{¶47}** Third, the questioning by the officer had nothing to do with the reason for the stop, but rather was designed to pressure Olan into confessing to soliciting a prostitute. On the body-camera video played at the suppression hearing, Officer Shideler can be heard telling Officer Buck about his strategy for questioning Olan—he planned to rapidly fire questions and then ask Olan how much he paid the passenger for sex. Rather than ask yes or no questions, he planned to ask questions that demanded thought, because "usually Johns don't know the game so you can get them

to admit." Officer Shideler was also questioned by defense counsel about this conversation. The Ohio Supreme Court has explained that this type of interrogation "designed to pressure a suspect to confess to illegal conduct—[] was of particular concern to the Supreme Court in *Miranda*." *Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, at ¶ 28 (distinguishing the interrogation of Oles and noting that the officer asked merely "the kind of general, on-the-scene questions that are typical of a routine traffic stop in which alcohol is suspected to be a factor"); *see Goodloe* at ¶ 14 ("The accusatory nature of the questioning also creates an air of authority that could further cause a reasonable person to believe that he was not free to leave and that he had to answer the officer's questions.").

{¶48} Fourth, and quite importantly, the officers took Olan's passport and did not return it to him prior to questioning. Defense counsel specifically argued to the court at the suppression hearing that Olan was not from the United States and that his passport was taken from him. The return of a person's driver's license during a traffic stop indicates that all business with the person is concluded and he is free to leave. *See, e.g., United States v. Lattimore*, 87 F.3d 647, 653 (4th Cir.1996), quoting *Florida v. Bostick*, 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (holding that after the return of the driver's license "a reasonable person would have felt free to decline the officer['s] requests or otherwise terminate the encounter"). "Courts have consistently held encounters to be consensual where the officer has already returned the license and registration to the individual before initiating questions outside of the scope of the traffic violation." *United States v. Griffith*, D.S.C. No. 8:10-cr-536-GRA-2, 2010 U.S. Dist. LEXIS 114960, 16 (Oct. 28, 2010) (compiling cases); *see also Ohio v. Robinette*, 519 U.S. 33, 35-36, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (holding

23

that once the officer returned the license to the defendant and issued the defendant a warning, the encounter became consensual even though the officer did not tell the defendant that he was free to go); *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir.1990) ("We find that a reasonable person would conclude that Winfrey was seized for purposes of the fourth amendment when his driver's license, automobile registration, and keys were retained by the officers and he was ordered to remain there until the DEA agents arrived."). Although retaining a person's identification during questioning about matters outside of the scope of the stop is not dispositive of the custody determination, "numerous courts have noted that the retention of a citizen's identification or other personal property or effects is highly material under the totality of the circumstances analysis." *United States v. Weaver*, 282 F.3d 302, 310 (4th Cir.2002), citing *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), and 4 Wayne R. LaFave, *Search and Seizure,* Section 9.3(a), at 103 n.74, (3d Ed.1996). Thus, the failure to return an important document like a passport prior to asking a suspect questions that are designed to get the suspect to confess to illegal conduct weighs in favor of a finding that the interrogation was custodial.

{¶49} Fifth, Olan was unable to speak much English and had to communicate with the officer through a translation application. *See, e.g., United States v. Ceballos*, 812 F.2d 42, 48 (2d Cir.1987), fn. 4 ("[W]e believe that the [reasonable person] test does recognize obvious incapacities that critically bear upon voluntariness such as a lack of fluency in English * * *."); *Thatsaphone v. Weber*, 137 F.3d 1041, 1045 (8th Cir.1998) ("We agree with the district court that a suspect's language skills may be relevant to the 'in custody' issue."); *United States v. Kim*, 292 F.3d 969, 977 (9th Cir.2002) ("Kim could well have assumed—especially given her limited English—that

she was a criminal suspect."). In *United States v. Jeong Seon Han*, 199 F.Supp.3d 38, 53 (D.D.C.2016), the court explained:

> The fact that a person does not speak or understand English clearly has an "objectively discernible relationship to [that] person's understanding of his freedom of action," and leads to certain "commonsense conclusions about behavior and perception" that apply broadly to non-English-speaking aliens as a class. *J.D.B. [v. North Carolina]*, 564 U.S. [261] at 272, 275, [131 S.Ct. 2394, 180 L.Ed.2d 310 (2011)] (citation and quotation omitted). This includes the conclusion that, while in custody, a non-English-speaking alien cannot "recognize and avoid choices that could be detrimental to them" in the same manner that an English speaker could. *Id.* at 272 (citation and quotation omitted). The inability to speak and understand English does not concern, as the Government appears to contend, "the psychology of the individual suspect"; rather, it concerns objective factors that bear on whether a suspect can understand a potentially custodial situation in much the same way that a child's age does. (Venue Sur-Reply at 4) (quoting *J.D.B.*, 564 U.S. at 275). While an adult English-speaking citizen of the United States can reasonably be expected to understand whether or not they are in custody, the same cannot be said for an English-speaking child, as reflected in *J.D.B.,* or for a non-English-speaking alien adult * * *.

{**¶50**}  Thus, the fact that Olan was a noncitizen from Mexico who did not speak or understand much English and could only communicate through a translation application, is certainly relevant to the totality-of-the-circumstances custody analysis.

**{¶51}** Finally, prior to the questioning of Olan, the officers arrested Olan's passenger. Along with the other circumstances I have listed, the arrest of a passenger could lead a reasonable person to believe that he was also in custody. *See United States v. Iglecias*, E.D.Tx. No. 4:21-CR-200-SDJ-CAN-1, 2023 U.S. Dist. LEXIS 104654, 44 (Apr. 21, 2023) (one factor in support of a finding that a reasonable person in the defendant's situation would have believed himself to be in custody was where "[d]efendant watched her fellow passenger be arrested and put in the back of a police car"); *United States v. Bengivenga*, 845 F.2d 593, 597, (5th Cir.1988), fn.16 ("The awareness of the person being questioned by an officer that he has become the 'focal point' of the investigation, or that the police already have ample cause to arrest him, may well lead him to conclude, as a reasonable person, that he is not free to leave, that he has been significantly deprived of his freedom * * *."). Olan was aware that he had become the focal point of a prostitution investigation and that the suspected prostitute had just been arrested.

**{¶52}** The lead opinion is incorrect in determining that any arguments regarding the retention of Olan's passport and the language barrier between Olan and the officers were not presented to the trial court. Both the lead and concurring opinions are incorrect in determining that the fact that Olan's vehicle was blocked in was not presented to the trial court. There was evidence and argument about these circumstances presented at the suppression hearing by way of video and testimony. I agree with the concurring opinion that the full body-camera video is part of the record on appeal. Accordingly, these arguments, in addition to arguments that the questioning was designed to pressure Olan into confessing to soliciting a prostitute

and regarding the coercive effect of his passenger's arrest, should be considered in our totality-of-the-circumstances analysis.

**{¶53}** The lead opinion also mentions that the portion of the video relied upon by Olan to demonstrate that his car was blocked in was not played at the suppression hearing. However, at the hearing, counsel clearly played Officer Shideler's body-camera video from 41 seconds to 2:22. That portion of the video shows that his vehicle was parked behind Olan and that Officer Buck's vehicle was parked next to Olan's vehicle. The video also shows other cars parked on the side of the road in front of Olan. In addition to the video evidence, Officer Shideler testified that he parked directly behind Olan and Officer Buck parked alongside Olan. Nevertheless, as stated above, the entire video is in the record. Thus, the circumstance of his car being blocked in was raised at the suppression hearing.

**{¶54}** No individual circumstance leads me to conclude that Olan was in custody. Rather, it is the totality of the circumstances that must be examined.

**{¶55}** The situation presented here exerted upon Olan pressures that sufficiently impaired his free exercise of his privilege against self-incrimination. Under the totality of the circumstances, a reasonable person in Olan's position would have understood himself to be in custody. Because Olan was interrogated without being advised of his *Miranda* rights, his motion to suppress his statements should have been granted.

**{¶56}** For these reasons, I dissent.

Please note:
The court has recorded its own entry this date.